SOUTHERN NATURAL GAS CORP. ᴇᴛ ᴀʟ. *v.*
ALABAMA.

No. 570.   Argued March 10, 1937.—Decided April 26, 1937.

*Messrs. Forney Johnston* and *Joseph F. Johnston* for appellants.

*Mr. Frontis H. Moore,* with whom *Messrs. A. A. Carmichael,* Attorney General of Alabama, and *Noel T. Dowling* were on the brief, for appellee.

Mr. Chief Justice Hughes delivered the opinion of the Court.

This case presents the question of the validity of a franchise tax assessed pursuant to a statute of the State of Alabama upon the Southern Natural Gas Corporation. The imposition of the tax was assailed as a direct burden upon interstate commerce and as also depriving the corporation of its property without due process of law and denying it the equal protection of the laws contrary to the Fourteenth Amendment of the Federal Constitution. The Supreme Court of the State sustained the tax (170 So. 178) and the case comes here on appeal.

The statute, enacted in pursuance of § 232 of the state constitution, is § 54 of Act No. 163, General Acts of Alabama, 1927, page 176, and provides:

"That every corporation organized under the laws of any other state, nation, or territory, and doing business in this State, except strictly benevolent, educational or religious corporations, shall pay annually to the State an annual franchise tax of Two dollars ($2.00) on each One Thousand Dollars of the actual amount of capital employed in this State."

The assessment was made by the State Tax Commission for the year 1931 in the sum of $11,047.43 and was said to be based upon capital employed in Alabama amounting to $5,523,715. Appellant resisted the assessment upon the ground that it was not doing business and did not propose to do business in the State of Alabama except in interstate commerce and that the property by which the tax was measured was used exclusively in interstate commerce.

The case was submitted upon an agreed statement from which the following facts appear:

Appellant was organized prior to May 12, 1928, under the laws of Delaware and on that date it qualified to do

business in Alabama. It named a statutory agent and filed in the office of the Secretary of State a copy of its charter which covered a wide range of activities.[1] It has paid annually the required permit fee. At the time of the assessment in question appellant maintained its office and chief place of business in the city of Birmingham, Alabama. The entire management, control and conduct of its business was conducted from that office.

Appellant is engaged in the transmission and distribution of gas which it purchases from the producers in the Louisiana and Mississippi fields. In May, 1929, it began the construction of its pipe lines and by January, 1931, it had constructed its main lines from the Louisiana fields to Atlanta and Columbus, Georgia, the Columbus line turning south from the Atlanta line at a point near Tuscaloosa, Alabama. In 1931, appellant owned approximately 564 miles of pipe and various items of real and personal property located within Alabama, all constituting part of its general transmission system. It was agreed that in the event that it should be held that all of appellant's property located in the State was subject to the assessment of a franchise tax, the value of that property as of January 1 to May 13, 1931, the date of the final assessment, was $5,500,000.

Appellant had contracts for the delivery of natural gas in Alabama to only four purchasers. Three were intrastate utilities in Alabama, the Alabama Natural Gas Corporation, the Southern Cities Public Service Com-

---

[1] The charter authorized appellant to store, transport, buy and sell oil, gas, salt, brine and other mineral solutions; to manufacture, acquire, distribute, use and sell artificial gas, with by-products; to mine, produce, buy, use, sell and distribute natural gas, with by-products; to produce, buy, use, sell and distribute a mixture of artificial and natural gas; to construct, acquire and operate all works and all pipe lines, mains, plants, systems, etc. for the above purposes, with the power of eminent domain; to acquire, manufacture and deal in ice.

pany and the Birmingham Gas Company. These companies were not consumers but were engaged, either directly or through subsidiaries, in the distribution of natural gas as public utilities in the State of Alabama. The fourth purchaser was the Tennessee Coal, Iron & Railroad Company, a subsidiary of the United States Steel Corporation, which purchased gas for itself and affiliated companies operating steel and industrial plants in the Birmingham district and which were not public utilities but consumers. A majority of orders for gas were received by and cleared through the Birmingham office; all collections for sales were received and disbursements for expenses were made or authorized at that office. The sales to the Tennessee Company and its affiliates were made from time to time upon orders given by the Birmingham office as the needs of the purchasers required.

The gas sold to the above-named purchasers was delivered in continuous movement from the gas fields in Louisiana or Mississippi without break or interruption, to the point where it was delivered, viz., the meter house at which the gas so sold was measured for the purpose of payment. The gas was moved under unregulated gas pressure, as produced by the natural pressure of the gas wells, to the designated points of delivery. The stipulation of facts also states that in the sales to the Tennessee Company and its affiliates the pressure is reduced at the point of delivery for the accommodation of the purchaser to meet its needs and requirements. The general practice is thus described in appellant's brief: "All gas delivered in Alabama moved under main line pressure in continuous movement from the wells in Louisiana to the immediate point of delivery in Alabama, where it was reduced in pressure and measured for the sole purpose of effecting delivery." [2]

---

[2] Appellant makes an explanatory statement in a foot note as follows: "It is a matter of general knowledge that long distance trans-

The agreed statement set forth appellant's contracts with the Alabama Natural Gas Corporation and the Tennessee Company, respectively. These contained detailed provisions as to delivery, pressure, measurement, etc. In the contract with the Tennessee Company provision was made for the establishment of service lines to the consuming plants, as follows, appellant being described as "Seller":

"Seller shall at its own expense provide in advance of the initial delivery date of March 1, 1930, service lines of suitable size to a point mutually agreed upon on the property of Buyer's Bessemer plant. To reach Buyer's Fairfield Plant Seller shall provide a service line that will cross Buyer's Ensley property and run in a southwesterly direction on the property of Buyer to some point mutually agreed upon, on Buyer's Fairfield premises. Buyer agrees that it will make no charge for right of way for any part of the service lines traversing its property. A suitable meter will be provided for metering gas that may be used in the Bessemer plant, in the Ensley plant and in the Fairfield plant of the Buyer and the plants of other subsidiary companies."

These plants, the state court said, were "widely separated." The contract also provides:

"The natural gas shall be delivered at a pressure of not less than 30 pounds gauge at some mutually satisfactory location or locations upon the premises of Buyer, and Seller shall there furnish, install, operate and maintain at its own expense regulating and measuring station or stations properly equipped with orifice meters and recording gauges or other type of meter or meters of stand-

---

mission of natural gas (appellant's system comprising about 1000 miles) moves under line pressure of approximately 400 pounds, greatly in excess of the requirement or required tensile strength of the distribution pipes of the utility or other purchasers from the long distance transportation company."

ard style as may be mutually agreed upon conformable to the current recommendations of Gas Measurements Committee of American Gas Association, the measurement by which shall fix the total amount of natural gas delivered by Seller to Buyer.

"The measuring equipment so installed by Seller, together with any building erected by it for such equipment, shall be and remain its property."

*First.*—The statute, which is challenged as here applied, was under consideration in *Anglo-Chilean Nitrate Sales Corp.* v. *Alabama,* 288 U. S. 218. In the light of the decisions of the Supreme Court of the State, this Court concluded that the tax was laid "not upon the authorization, right or privilege to do business in Alabama, but upon the actual doing of business." *Id.,* p. 223. The tax was held invalid as applied to a foreign corporation whose sole business in the State consisted in the landing, storage and sale in the original packages, of goods imported from abroad. In the instant case the Supreme Court of the State has reviewed its rulings and has expounded the meaning of the statute. The state court holds that the tax is a franchise tax laid "upon the right to do business." It is a tax levied "on foreign corporations as a prerogative to the right of exercise of its corporate functions in the State." It "is not on any basis a tax on business" but is laid "on the exercise of corporate functions, or on the privilege of exercising corporate functions within the State and its employment of its capital in Alabama."

By compliance with the statute appellant obtained the privilege of engaging within the State in any of the activities which its charter authorized.

*Second.*—Appellant made Birmingham, Alabama, its headquarters for the transaction of business. The "entire management" was conducted from its principal office at that place. There, as the state court said, was "the control of the business in all of its aspects." There orders

for deliveries of gas under its contracts and all collections from sales were received and all disbursements were made or authorized. While Delaware was the State of incorporation, appellant's commercial domicile was in Alabama. *Wheeling Steel Corp.* v. *Fox,* 298 U. S. 193, 211.

From the agreed facts we are unable to conclude that the business thus conducted in Alabama was entirely an interstate business. While the gas which appellant sold was brought into the State from Louisiana, it appears that appellant carried on in Alabama activities of an intrastate character. We had occasion in *East Ohio Gas Co.* v. *Tax Commission,* 283 U. S. 465, 470, to consider the distinction between the transportation of gas into a State and the furnishing of the gas so transported to consumers within the State. We observed in that case that "when the gas passes from the distribution lines into the supply mains, it necessarily is relieved of nearly all the pressure put upon it at the stations of the producing companies," its volume is expanded, and it is divided into the smaller streams that enter the service lines connecting such mains with the pipes on the consumer's premises. In that case, the Ohio Company furnished gas to consumers in municipalities by means of distribution plants and that activity was held to be not interstate commerce but a business of purely local concern exclusively within the jurisdiction of the State. The Court quoted with approval the statement in *Missouri* v. *Kansas Gas Co.,* 265 U. S. 298, 309, that "The business of supplying, on demand, local consumers is a local business, even though the gas be brought from another State and drawn for distribution plants directly from interstate mains; and this is so whether the local distribution be made by the transporting company or by independent distributing companies. In such case the local interest is paramount, and the interference with interstate commerce, if any, indirect and of minor importance."

While the facts of the two cases are not the same, there is a clear analogy. For here under its contract with the Tennessee Company, which bought for consumption by itself and its subsidiaries in industrial plants, appellant agreed not simply to install metering stations, for measuring the amount of gas delivered, but to establish the requisite service lines running to the described plants in order that the gas might be furnished in a manner suited to the consumers' needs. The gas was supplied through these service lines on the orders received from time to time at the Birmingham office. We perceive no essential distinction in law between the establishment of such a local activity to meet the needs of consumers in industrial plants and the service to consumers in the municipalities which was found in the Ohio case to constitute an intrastate business. As was said in that case: "The treatment and division of the large compressed volume of gas is like the breaking of an original package, after a shipment in interstate commerce, in order that its contents may be treated, prepared for sale and sold at retail."

The facts thus distinguish the instant case from that of *Ozark Pipe Line Corp.* v. *Monier,* 266 U. S. 555. There the corporation operated a pipe line extending from Oklahoma through Missouri to a point in Illinois. Missouri sought to tax the privilege of doing business within the State. But nothing was done in Missouri except in furtherance of transportation. Oil was neither received nor delivered in that State. The business actually carried on "was exclusively in interstate commerce" and whatever was done within Missouri in the maintenance of an office or otherwise was "all exclusively in furtherance of its interstate business." *Id.,* p. 565. In *Missouri* v. *Kansas Gas Co., supra,* as noted above, the distinction was pointed out. There "the transportation, sale and delivery" of the gas constituted an "unbroken chain, fundamentally interstate from beginning to end." So,

the case of *State Tax Commission* v. *Interstate Natural Gas Co.*, 284 U. S. 41, rested upon the conclusion that what was done was wholly incidental to interstate commerce between Louisiana and Mississippi. There were no such local activities as are present here to carry the transactions of the company into the field of state authority.

That authority was held to be properly exerted in the case of *Atlantic Lumber Co.* v. *Commissioner*, 298 U. S. 553. The corporation was organized in Delaware but it did not "function there" but in Massachusetts. There it established its office for the exercise of its corporate powers. That was the headquarters for salesmen who solicited orders in that and other States. There orders were accepted and remittances received. The corporation was engaged in the wholesale lumber business and owned practically all the stock of three subsidiaries, two of which were engaged in cutting timber and manufacturing lumber in other States, and a third held title to timber lands in Louisiana. The court said that if appellant did nothing but transact interstate business, the excise tax sought to be levied with respect to the doing of business in Massachusetts could not stand, but in view of the activities conducted in Massachusetts and the corporate functions there exercised, the court decided that the privilege tax was valid and that the effect upon interstate commerce, so far as there was any, was "remote and incidental." Because of the local activities, the decision in the *Ozark* case was held to be inapplicable.

*Third.*—As Alabama was competent to lay a franchise tax upon appellant for the privilege of doing an intrastate business, it was competent to measure the tax by the capital employed within the State provided the tax was not so laid as to discriminate against interstate commerce or otherwise lay a direct burden upon it. *Postal Telegraph Cable Co.* v. *Adams*, 155 U. S. 688, 696; *St. Louis South-*

*western Ry. Co.* v. *Arkansas,* 235 U. S. 350, 364–367; *Underwood Typewriter Co.* v. *Chamberlain,* 254 U. S. 113, 119, 120; *St. Louis-San Francisco Ry. Co.* v. *Middlekamp,* 256 U. S. 226, 231; *Hump Hairpin Co.* v. *Emmerson,* 258 U. S. 290, 294; *International Shoe Co.* v. *Shartel,* 279 U. S. 429, 433; *Western Cartridge Co.* v. *Emmerson,* 281 U. S. 511, 513, 514; *Atlantic Lumber Co.* v. *Commissioner, supra.*

There is here no attempt to tax property that is beyond the boundaries of the State. The tax was laid only upon property employed within the State and enforcement is left to the ordinary means of collecting taxes. The rule was thus stated in *International Shoe Co.* v. *Shartel, supra:* "A franchise tax imposed on a corporation, foreign or domestic, for the privilege of doing a local business, if apportioned to business done or property owned within the State, is not invalid under the commerce clause merely because a part of the property or capital included in computing the tax is used by it in interstate commerce." There is no showing of any direct burden upon interstate commerce, the effect upon that commerce being incidental and remote, not differing in this respect from the effect of ordinary *ad valorem* taxation of property within the State. *Postal Telegraph Cable Co.* v. *Adams, supra; St. Louis Southwestern Ry. Co.* v. *Arkansas, supra.*

The judgment of the Supreme Court of Alabama is

*Affirmed.*