Memphis Natural Gas Co. *v.* Pope *et al.*[*]

(*Nashville,* December Term, 1940.)

Opinion filed May 17, 1941.

[*]Affirmed 315 U. S., 649, 62 S. Ct., 857, 86 L. Ed., —.

ARMSTRONG, McCADDEN, ALLEN, BRADEN & GOODMAN, of Memphis, for complainant.

ROY H. BEELER, Attorney-General, WILLIAM F. BARRY, Assistant Attorney-General, and LEWIS S. POPE and WHITWORTH STOKES, both of Nashville, for defendant.

MR. SPECIAL JUSTICE FRANK T. FANCHER delivered the opinion of the Court.

The complainant, a Delaware corporation, domesticated in Tennessee with its chief place of business in Memphis, Tennessee, filed the bill against certain officials and tax collectors of the State of Tennessee to enjoin the collection of excise taxes for the years 1932 to 1936 and for a declaration of rights, status and legal relations. An injunction was obtained to prevent the levies by distress proceedings.

The excise tax is that provided by 1932 Code, Sec. 1316 et seq. It is alleged that the assessments are in violation of constitutional rights, asserting that the taxes are on the right to do business which is exclusively interstate commerce.

The bill was sustained by the Chancellor and the injunction made permanent.

Upon appeal and proper assignments of error, extensive briefs and argument, the case is here. The essential facts which are presented by evidence supported by the pleadings are as follows:

The Memphis Natural Gas Company was promoted and organized in 1928 and so was Memphis Power and Light Company. They were associated together by contract in furnishing natural gas brought from the gas fields at Monroe, Louisiana, into the State of Tennessee. Complainant brings the gas in pipe lines, the entire line with its branches in Tennessee extending 370.5 miles in length. Complainant has a contract with Memphis Power and Light Company to distribute the gas to consumers in Shelby County, Tennessee, and with West Tennessee Power and Light Company which distributes the gas to other places in West Tennessee.

The excise taxes for the years 1932-1936, both inclusive, enjoined, amounted to $57,156.83. Since the bill was filed the taxes for 1936 were withdrawn from the litigation by the defendants.

There are compressor stations along the transportation line at intervals to force the flow of gas.

Complainant furnishes one buyer in Arkansas, the Arkansas Power and Light Company, and none in Mississippi.

The gas is delivered to Memphis Power and Light Company at Brooks Avenue in Memphis, and nine other stations in Shelby County, with measuring meters at each. The gas is measured by the cubic foot, or in thousands of cubic feet. These meter instruments act by means of recorded pressure on charts.

The deliveries to West Tennessee Power and Light Company are at seven points by like measures of gas flow. By contract with West Tennessee Power and Light Company complainant extended its pipe line at its own expense for purposes of delivery by main lines and laterals from Memphis to the towns of Covington, Brownsville, Ripley, Jackson, and Humbolt, in West Tennessee, and these lateral lines are owned and operated by complainant.

The flow from the fields in Louisiana is continuous until delivered at these stations. There is an attempt to obtain a constant pressure along the main pipe line at a much higher pressure than can be used in the distribution lines.

At these meter stations, where the gas is delivered by Memphis Natural Gas Company to the distributing corporations, an attempt is made by Memphis Natural Gas Company to obtain a constant pressure in order

that the gas may be measured, and an apparatus is used to reduce the pressure as it enters the distribution systems. To do this it is necessary to keep in touch with the requirements of the various markets from hour to hour, and men are kept on the operations for this purpose. The stations are so operated to suit the conditions that prevail at any time. During certain hours of use, the load is diminished more rapidly and a regulator machine is used to control pressure.

Complainant uses a private telephone line extending the length of the pipe lines and a dispatcher is kept at Memphis to control the input of gas and to report troubles. Line walkers and repair crews keep up the lines.

The books and records of Memphis Natural Gas Company are kept at Memphis in its main office, and its entire business is conducted from Memphis as its general headquarters. It owns its own pipe lines and purchases the gas from a producing company. The president of Memphis Natural Gas Company lives in Memphis. The offices consist of eight rooms, and approximately twelve people are employed in the offices.

The distributing lines and appliances for sale and distribution belong to Memphis Power and Light Company. Each of these companies employs its own men and makes its own purchases of materials.

The percent of revenues of Memphis Natural Gas Company derived from Memphis Power and Light Company, to its total revenues, was:

| 1932, | 83.24% |
| 1933, | 83.08% |
| 1934, | 81.47% |
| 1935, | 80.06% |

So that the bulk of all complainant's revenues from every source is derived from its business done with and through Memphis Power and Light Company.

These two corporations were promoted and organized for the purpose of doing the business now in hand, that is, bringing natural gas into Memphis and distributing it to the consuming public. For this purpose and co-incidentally a franchise was obtained from the City of Memphis. This franchise runs in the name of Memphis Power and Light Company. However, at the same time, the contract hereinafter set forth was executed by and between Memphis Natural Gas Company and Memphis Power and Light Company and this contract was filed with the city as a part of the contract with the city by which the twenty-five year franchise was granted. A provision in the contract, which materially affects the obligations to the City of Memphis, representing the public and affecting the material rights of both these companies financially, will be referred to and explained later. The case, as we view it, largely turns upon the contract between these two companies and with the city. This contract between the two companies is named a contract of bargain and sale. Memphis Natural Gas Company is called seller and Memphis Power and Light Company is called buyer; and it is argued that by its terms, seller sells to buyer all the gas it will need. The contract is complicated and long. A study of it leaves one with an impression that there was a studied effort to cover up a pooling of interests with the varnish of a sale. To understand it there is required more than surface inspection of the varnish. We must look through the gloss finish and see what is underneath.

It is argued by counsel for complainant that there is

a sale of gas at a fixed price, subject to future adjustment; and that the gas is delivered to the buyer in direct flow of interstate commerce. Counsel for defendants contend that the provision for sale at a stipulated price is but part of a scheme of partnership in which the so-called seller is a partner with the buyer and engaged with it in the sale and distribution of gas to local consumers and that each party is interested in the business conducted by the other.

At the present time, under the Uniform Partnership Act in Tennessee, the word person includes corporations; and in the provisions defining partnerships the word person is used in such way as to indicate that a corporation may be a partner. Code, secs. 7841, 7845.

The sharing by a person of profits of a business is prima facie evidence he is a partner in the business. Code, sec. 7846.

But, whether a corporation can technically become a partner, or whether it requires charter authority to become a partner, a corporation can make contracts in pursuance of its corporate powers that will bind it in joint adventures or undertakings. And, even without joint control of the operations that produce profits, persons or corporations may establish relationships that will result in a sharing of profits, each with the other. There is no law against two public utilities engaged in supplying gas to a community to so divide or parcel their work as to give each separate management of a portion and then pool their earnings, regardless of the technical rules of partnership. The right to contract is free enough to include such an arrangement, and there is no vice in it.

One may be an agent of the other in details, but activities do not have to be classified to make them lawful.

In this contract of May 24, 1928, which was executed between Memphis Natural Gas Company and Memphis Power and Light Company, and presented to the City of Memphis to induce the city to grant the franchise, it was stipulated that the seller agrees to sell and the buyer agrees to buy, take and pay for such amounts of natural gas as may be requisite to fulfill all contracts for sale; and, second, for the use by the buyer for its electric generating plant.

By the fifth article, the seller was to furnish, install, operate and maintain at is own expense a regulating and measuring station and meter the gas with certain temperature and specific gravity tests.

By the sixth article subject to adjustment provisions in article eleventh, certain graduated prices or rates, according to the class of use, were named.

By the ninth article, briefly stated, the seller was monthly to deliver to buyer and to the City of Memphis, a statement setting forth in reasonable detail: 1. Seller's investment, including cost of pipe lines, installations, etc. 2. Gross revenues from sale of gas to seller. 3. All costs of maintaining and operating. 4. Costs of renewals, replacements, etc. 5. Amount necessary for a fifteen year 6% sinking fund to amortize seller's investment. 6. All taxes. 7. Six per cent at the end of each year of seller's investment for extraordinary maintenance, renewals, replacements or amortization. 8. Net surplus or net deficit of seller for the contract year.

By the tenth article, buyer was to deliver, yearly, to seller and to the City of Memphis, the same information of its affairs and operations as those required of seller, listed above.

The eleventh article is lengthy, but its importance warrants its copy in full as follows:

"Eleventh: It is understood and agreed by the parties hereto that the amount of the combined net surpluses or combined net deficits of the Buyer and the Seller for each contract year, as shown by the statements rendered under Articles ninth and tenth hereof, shall (until after the provisions of the next succeeding paragraph shall have become operative) be equally divided between the Buyer and the Seller by a cash adjustment to be made each year as soon as possible after the rendering of the statements provided for in Articles ninth and tenth hereof, and at the same time the parties shall agree upon such adjustments, if any, in the rates set forth in Article sixth hereof as may be calculated to be necessary in order as nearly as possible to effect an equal division of any contemplated combined surplus and/or deficit for the contract year then current and for subsequent contract years.

"If in any contract year (a) all the net deficits of both parties for all contract years up to such time, as shown by the statements rendered under Articles ninth and tenth hereof, shall have been made up and (b) in addition thereto, the Buyer shall have received from the combined net surpluses, as shown by such statements, an amount equal to one and one half per cent of each of the respective amounts of the Buyer's investment shown under (7) of the statements rendered under Article tenth for each and every respective contract year up to such time, then the entire balance of the combined net surplus for such contract year shall be paid to or retained by the Seller and thereafter no further changes in the rates set forth in Article sixth hereof (or in such rates as theretofore adjusted under the foregoing provisions of this

Article eleventh) shall be made except such changes in such rates, if any, as may be required under the provisions of the next succeeding paragraph of this Article eleventh. In all subsequent contract years, the entire balance of the Buyer's net surplus for each subsequent contract year over and above an amount equal to one and one-half per cent of the amount of the Buyer's investment shown under (7) of the statement rendered under Article tenth for such subsequent contract year shall be paid to the Seller.

"In each and every contract year during the continuance of this agreement or any extension thereof after (A) all the net deficits of both parties for all contract years up to such time, as shown by the statements rendered under Articles ninth and tenth hereof, shall have been made up and (B) in addition thereto, the Buyer shall have received from the combined net surpluses, as shown by such statements, an amount equal to one and one-half per cent of each of the respective amounts of the Buyer's investment shown under (7) of the statements rendered under Article tenth for each and every respective contract year up to such time, and (C) in addition thereto, the Seller shall have received from the combined net surpluses, as shown by such statement, net earnings affording it a reasonable return in view of the hazards of the undertaking of the Seller at the inception thereof, upon the respective amounts of the Seller's investment shown under (7) of the statements rendered under Article ninth for all contract years up to such time, then the Seller and the Buyer agree to and will cooperate to bring about a reduction in the rates to be charged by the Buyer to its customers in the following manner:

"1. The parties shall agree upon such adjustment in the rates set forth in Article sixth hereof (or in such

rates as theretofore adjusted under this Article eleventh) as may be calculated to be necessary in order as nearly as possible to reduce the operating expenses of the Buyer in subsequent contract years by an amount equal to the balance of the combined net surplus for such contract year over and above the deductions contemplated by subdivisions (A), (B) and (C) of this paragraph, and

"2. The Buyer shall then reduce its rates to its consumers in such amount as may be calculated to be necessary in order as nearly as possible to effect a reduction in the gross revenues of the Buyer for ensuing contract years in an amount equal to the balance of the combined net surplus for such contract year over and above the deductions contemplated by subdivisions (A), (B) and (C) of this paragraph. It is agreed that such reduction of rates by the Buyer pursuant to the provisions of this paragraph of this Article eleventh, shall be applied first toward lowering the price of gas to domestic consumers.

"Each party shall have the right to examine the books, records, vouchers, and charts of the other party to the extent necessary to verify the accuracy of any statement, charge, or adjustment made pursuant to the provisions of any Article hereof. If such examination reveals any inaccuracy in the statements, charges, or adjustments theretofore made, the necessary adjustment shall be promptly made.

"The City of Memphis shall have the right by a reputable firm of certified public accountants or engineers, apponted by resolution of the City Commissioners, to examine the books and accounts of the parties hereto to the extent necessary to verify the accuracy of any statement or adjustment made under or pursuant to the provisions of said Articles ninth, tenth or eleventh. If such ex-

amination reveals any inaccuracy in the statements or adjustments theretofore made, the necessary adjustments shall be promptly made.''

There is filed copy of the franchise granted by the City of Memphis to the Memphis Power and Light Company until January 1, 1958. This franchise shows that the contract between the pipe line corporation and the grantee is filed with the city and contemplates the co-operation of the two concerns, and provides a scale of rates to the consumers for gas. It is in this way indicated that the city is a contracting party with both these utility corporations.

The City of Memphis is a party to the contract in that, if Memphis Natural Gas Company realizes the net profits provided for on its investment from the inception of the enterprise, there is an adjustment of rates and the gas rate is reduced down to take up that excess profit. Thus we see complainant is dealing with the public in Memphis, represented by the City of Memphis.

The entire setup and the whole contract between the two companies and the public shows a joint understanding. Mr. Johnson, president of the complainant company, in cross-examination, was asked by Mr. Pope a hypothetical question as follows: ''Suppose on the 10th day of January, 1935, the Memphis Power and Light Company had made enough profits on its business to have complied with all these conditions in here: that is, 6% we will say, the reasonable return to them, the same amount to you, and suppose they would have had $50,000 left over and above that, and after they had realized one and one-half per cent on their investment, what would have become of that $50,000 under this contract?''

After much pressure by the attorney and much evasion by the witness, driving at the making and disposition of the supposed $50,000, witness said:

"I would not say it is made by the Memphis Power and Light Company."

"Q. By Mr. Pope: Who is it made by? A. It is made by both of us."

The witness admitted the fallacy of his own position when he said such supposed $50,000 of net earnings had been made by both companies; and he finally was forced to admit that such supposed net balance would go under section eleventh to the pipe line company. That resulted under the following provision in Section 11 of the contract: "If in any contract year (a) all the net deficits of both parties for all contract years up to such time, as shown by the statements rendered under Articles Ninth and Tenth hereof, shall have been made up and (b) in addition thereto, the Buyer shall have received from the combined net surpluses, as shown by such statements, an amount equal to one and one-half per cent of each of the respective amounts of the Buyer's investment shown under (7) of the statements rendered under Article Tenth for each and every respective contract year up to such time, then the entire balance of the combined net surplus for such contract year shall be paid to or retained by the Seller. . . ."

It will be seen that by the above provision, not only is "Seller" a participant in the profits of the distribution of gas in Shelby County by the Memphis Power and Light Company, but after a certain situation is reached the "Seller" would receive all the remaining profits of the distribution.

It is not necessary to determine when title to the gas

passed to Memphis Power and Light Company, or whether title ever actually passed. If title passed, then, still the business conducted in distributing to consumers was for and on behalf of both these development and operating corporations, and Memphis Natural Gas Company was engaged through its co-operative in intrastate business in Tennessee.

The price of gas, if there ever was an actual sale, was not and could not be determined until after the gas had been delivered to the ultimate consumer. Our view is, that there is not a fixed price in article sixth which is merely adjusted by article eleventh, but in reality there was an operation in which both companies were jointly interested. There was an allotment of work performed but a division of the entire results of that work.

Whether the scheme of separate corporate entity, but joint profit, was designed in the beginning for purposes of economy, safety in business and to escape taxation, is a matter which may very reasonably be concluded.

There seems to be separate corporate entity, as was found by the Chancellor. This does not preclude a conclusion that these gas companies acted in concert and each was a party to and interested by contract in the operations, profits and/or losses of the other and that the whole business is so intertwined as to make their business joint. The business done in Tennessee by complainant with the West Tennessee Power and Light Company amounted to approximately one or two percent during the years in question.

The business done with Memphis Power and Light Company for its generating plant bore the following proportion to its total business with that company:

| 1932 | 33.49% |
| 1933 | 33.22% |
| 1934 | 27.78% |
| 1935 | 24.34%. |

This gas furnished to the electric generating plant was on a straight buyer and seller contract basis to furnish gas on demand. This contract was separate from the distribution contract hereinbefore discussed, but was to take effect contingent on that one being executed.

It is improper to look alone to article sixth, which ostensibly shows a sale, but the whole arrangement must be seen. In illustrating a unit composed of many parts, the great Apostle spoke of the human body as being many members in one body. He said: "The eye cannot say unto the hand, I have no need of thee." This philosophy is the modern doctrine of construction.

Considering what is interstate commerce, the technical considerations of when things come to rest, or continuity of flow, of original package or the breaking up, and the like, are not the last word.

In the whole field of law we find first technical measurements, and then come practical considerations. Once we looked to controlling phrases, then later the four corners of the instrument. These are the processes of evolution in the law.

In the instant case we take article sixth for what it is worth and for what it was intended. It is a mathematical formula inserted to help in the measurement of profits, to be divided when complainant is given credit for the prices therein mentioned as applied to the various uses to be made of the gas; and Memphis Power and Light Company is given credit for the sales to the various users of gas and the upkeep and amortization of invested

capital is counted; and a certain stipulated profit is calculated, then the profits are divided from the entire enterprise.

We are not to be deceived by subtle arguments over passages considered singly. The whole field of the enterprise must be seen to comprehend it. It is considerably like two partners, one to buy and haul in, another to sell, with two bank accounts and two sets of books, and at the end of each year a division of profits. The buying partner turns in the goods at certain prices, but these prices are just figures. In the end there is a division. They are both merchants in the same enterprise.

There is testimony from which defendants say there is a union between these utility corporations. It is insisted from the evidence that Memphis Power and Light Company and West Tennessee Power and Light Company are registered subsidiaries of the National Power and Light Company, it being a subsidiary of Electric Bond and Share Company, owning 99.9% of the voting stock of Memphis Power and Light Company and 100% of the stock of West Tennessee Power and Light Company. Also that complainant is a part of the Electric Bond and Share Company group, by ownership of an interest in its stock.

The case of *Lone Star Gas Company* v. *State of Texas*, 304 U. S., 224, 551, 58 S. Ct. 883, 82 L. Ed., 1304, and other cases are cited, which hold that if a corporation sells gas in a State to associations or corporations having the same parent holding company, the business is intrastate commerce. There is exception to the competency of this evidence on the ground that the experts obtained their information from Moody's Manual and is therefore hearsay. Assignment of error is made by complainant on this appeal to the ruling of the Chancellor admitting

this evidence. We do not pass upon this evidence or its effect. The authorities so holding that such a combination is incompatible with the idea of interstate commerce is equal authority for a denial of the claim where the unity between the parties is a contractual bond.

Affiliated companies cannot be more effectually united than those bound together by bonds of joint adventure. The bond here is like the union of the Siamese twins. There are separate hands and feet and heads, but a union of the two bodies. That bond is the contract. The hands on one side bring in, and on the other distribute. Twin A gets half the money; Twin B gets the other half up to a certain point, and then Twin A gets it all. Counsel for complainant has what he calls his "paper book." It is a collection of cases procured from West Publishing Company, considering interstate commerce in natural gas transportation. While the cases are unlike the instant one, we are justified in holding that though the gas has come into Tennessee in a movement that is interstate in character, yet when it is sold to consumers by distribution or upon orders on demand, considering all its activities, it is intrastate business. This is true though the gas so furnished is drawn from interstate mains. *Southern Natural Gas Corporation* v. *State of Alabama,* 301 U. S., 148, 57 S. Ct., 696, 698, 81 L. Ed., 970.

Many of the facts in the above case are like those here. As here, the complaining company was bringing gas from the fields in Louisiana into Alabama, where it had contracts with four purchasers, three of which were intrastate utilities and one, the Tennessee Coal, Iron and Railroad Company, purchased gas for itself and affiliated companies. The complainant had a Delaware charter, but had domesticated in Alabama and had its chief office

in Birmingham, where it is conducted—as in this case—its entire business. It paid its annual required permit fee, as here. It constructed its lines reaching into Georgia. It possessed various items of property in Alabama, constituting its general transmission system. A majority of orders for gas were received by and cleared through the Birmingham office. All collections from sales were received and disbursements for expenses were made or authorized at that office. The sales to the Tennessee company and its affiliates were made from time to time upon orders given at the Birmingham office, given as the needs of the purchaser required. The gas sold was delivered in continuous movement from the gas fields without break or interruption to the point where it was delivered, viz.: the meter house, where it was measured for the purpose of payment. The gas was moved under unregulated pressure. The pressure was reduced at the point of delivery for the accommodation of the purchaser to meet his requirements. The contracts with the companies contained provisions as to delivery, pressure, measurements, etc.

The measuring equipment belonged to seller. In the contract with the Tennessee company the seller provided at its expense service lines at the buyer's Bessemer plant and another plant, widely separated.

The main difference in the above case on the facts, to the facts here, consists in the seller providing the service lines to the Tennessee company, and the further fact that there was no association between seller and buyer as in the instant case. We regard the instant case a stronger one to support the tax because of this joint enterprise feature.

Chief Justice HUGHES wrote the opinion affirming the Alabama Supreme Court, in which it was said: "From the agreed facts we are unable to conclude that the business thus conducted in Alabama was entirely an interstate business. While the gas which appellant sold was brought into the State from Louisiana, it appears that appellant carried on in Alabama activities of an intrastate character."

As in other more recent cases, the Supreme Court apparently treated it as a case problem on all its facts.

■ Complainants charge in the bill that the excise taxes for the years 1932 and 1933 are barred by the statute of limitations of three years, the due date for payment being July 1, 1933, and July 1, 1934.

The statute pleaded is Section 1487 of our Code. It is attached to authority for back assessing taxes upon property, and the limitation is: "but no taxes on property for more than three years back shall be assessed and collected where they have not been assessed and not paid in consequence of the errors or omissions of former collectors or assessors."

On its face this only applies to property taxes. Counsel refer to an expression in *Foppiano* v. *Speed,* 113 Tenn., 167, 173, 82 S. W., 222, 223. The tax there involved was a tax imposed upon persons selling beer, or any quantities of liquor on steamboats or any other vessel or watercraft, or from railroad cars; and they were required to pay a tax in lieu of all other taxes of $200 per annum. The Court said: "The limitation of three years is fixed in analogy to the limitation fixed upon other back taxes."

The tax in that case was to take the place of any property or other tax. The tax here is a corporation excise tax which has no relation to property taxes. The tax here imposed is provided, not in the article where the

three year limitation is found, but in the article on excise taxes—a different subject of taxation—which provides for a different system of collection by means of different officers therein designated. The collection is made by the commissioner of finance and taxation. No limitation is provided by the Act.

There is a general limitation on collection of all taxes, of whatever nature, contained in Section 1494 of the Code, and fixes the time within six years. We think this six-year limitation is the one applicable here, and not the limitation of assessors and collectors by county officials to back assess property.

The tax analogy is not sufficiently complete for a Court to set up by judicial construction a limitation imposed in a special but different situation.

The decree of the Chancellor is reversed, the injunction dissolved, and the bill dismissed at complainant's cost.

Defendants may take a reference for damages as against the injunction bond for the wrongful suing out of the injunction.

GREEN, C. J., and McKINNEY and DeHAVEN, JJ., concur.

CHAMBLISS, J., dissents.

DISSENTING OPINION.

MR. JUSTICE CHAMBLISS delivered the dissenting opinion.

I am constrained to dissent. It is clear and I think, in effect, recognized on the briefs of the State and in the opinion of the majority, that the flow of the gas in question is continuous across State lines into Tennessee to the points of delivery, without having come previously to a stop, to (1) Memphis Power & Light Company and (2) West Tennessee Power & Light Company, in-

trastate distribututors of the gas. As I understand the holding of liability is rested on the theory and finding that the interstate seller and shipper and the intrastate buyer and distributors are copartners, jointly interested in the business of gas distribution to consumers locally, the parties operating under a profit sharing plan—and that, therefore, the tax applies to all of the product conveyed through its pipe lines into this State from its wells in Louisiana. (This liability is held to apply not only to the gas sold and delivered to the Memphis Power & Light Company, whose relations with the Memphis Natural Gas Company are construed to have the effect above stated, but extended to the gas sold and delivered to the West Tennessee Company also.)

While this theory is stated forcefully and plausibly, I am unable to accept it. At last, upon analysis, the arrangement between these companies, conceded to be legally distinct corporate entities, held to constitute, in effect, a partnership, relates alone to the method and measure of the compensation which the interstate seller and shipper receives for its product from the intrastate buyers and distributors.

No authority is cited for the adoption of the method or extent of payment by a buyer of goods shipped interstate, as a factor determining the taxability of the product. The opinion of HUGHES, C. J., in *Southern Natural Gas Corporation* v. *State of Alabama*, 301 U. S., 148, 57 S. Ct., 696, 698, 81 L. Ed., 970, cited and quoted from in the majority opinion, does not adopt or discuss this theory of partnership profit sharing, or joint enterprise. Liability was predicated in this case on a finding that the gas company *itself*, not through another, "carried on in Alabama activities of an intrastate character,"

—taking orders and making sales and maintaining service lines to various and sundry consumers, etc. The majority opinion concedes that in that case "there was no association between Seller and Buyer."

Not only do I find no case where such an "association" of the buyer and seller has been dealt with, but I am impressed that the opinion of Mr. Justice CARDOZO in *People ex rel. Pennsylvania Gas Co.* v. *Saxe et al.*, 229 N. Y., 446, 128 N. E., 673, 674, announces the correct principle to the effect that the liability for taxes to a state on goods shipped into a state, does not turn on, and is not to be determined by, the amount, measure or method of compensation; and that a plan of payment under which the amount of compensation is determined by the profits earned by the buyer distributing the product does not deprive the interstate seller of the exemption inuring under the commerce clause. In that case the compensation of the interstate shipping company was based on the gross receipts of the local distributor. The contracts were what is known as "requirement" contracts, that is, the amount delivered was determined by the requirements from time to time of the distributors. CARDOZO, J., writing the opinion for the Court, said, "We think the interstate character of the relator's business is untouched by these arrangements." Further, "the sale does not cease to be one in interstate commerce because the price is to be measured by the purchaser's recipts." I think the arrangement in the instant case was a sales contract between the parties, with provisions—somewhat complicated—for regulation and adjustments of the price to be paid for the natural gas. I think the illustration suggested on the brief of counsel for the Natural Gas Company of the modernly common landlord and tenant lease

contracts presents an apt analogy, the rental being based on the volume of business and incidental profits of the tenant. Here is a profit sharing compensation plan of fixing compensation, but the independence of the status of the parties is otherwise maintained, and the taxes, or other obligations of the parties, are not affected. Another simple illustration: A, a seller, in Dakota, contracts with B, a Tennessee buyer, to sell and ship wheat in such volume as the buyer may require through a given season. The price to be paid A is based on a fixed minimum sum per bushel, plus fifty per cent of any excess realized by the buyer from his sales of the wheat. Does this profit sharing arrangement defeat the interstate commerce immunity of the interstate shipment? I think not.

Since, as above indicated, I construe the holding of the majority opinion to be rested on the partnership in profits theory, I confine this brief comment to this theory. However, I have examined the opinion in *Southern Natural Gas Corporation* v. *State of Alabama,* and I think the facts so differ from those of the instant case as to distinguish determinatively the cases. In the Alabama case, as said in the opinion, "under its contract with the Tennessee Company, which bought for consumption by itself and its subsidiaries in industrial plants, appellant agreed not simply to install metering stations, for measuring the amount of gas delivered, but to establish the requisite service lines running to the described plants in order that the gas might be furnished in a manner suited to the consumers' needs. The gas was supplied through these service lines on the orders received from time to time at the Birmingham office."

The Tennessee Company had a large number of these plants scattered over the State to which the Southern

Natural Gas Company delivered gas through service lines which it owned and maintained, upon orders received and filled from its Birmingham office from time to time. Nearly six hundred miles of its pipes covered the State and carried gas for allotment as required for distribution to these numerous consumer plants. I do not understand that the Memphis Natural Gas Company owned or maintained any service lines, but that the local companies tapped the main pipe line of the Natural Gas Company. The "distinction between the transportation of gas into a State and the furnishing of the gas . . . to consumers within the State," to quote the Alabama opinion, appears to have been preserved—as it was not in that case. Many activities may be carried on within the State without subjecting the interstate transportation to the State taxing power, so long as these activities are merely incidental to the doing of the interstate business. *Ozark Pipe Line Corporation* v. *Monier,* 266 U. S., 555, 45 S. Ct., 184, 186, 69 L. Ed., 439. In that case it was said: "The business actually carried on by appellant was exclusively in interstate commerce. The maintenance of an office, the purchase of supplies, employment of labor, maintenance and operation of telephone and telegraph lines and automobiles, and appellant's other acts within the state, were all exclusively in furtherance of its interstate business, and the property itself, however extensive or of whatever character, was likewise devoted only to that end. They were the means and instrumentalities by which that business was done and in no proper sense constituted, or contributed to, the doing of a local business."

I do not find that the Memphis Natural Gas Company conducted any business in Tennessee which was not inci-

dent to, and in furtherance of, its interstate deliveries. These, briefly stated, being my views, I think the decree of the Chancellor should be affirmed.