*MEMPHIS NATURAL GAS CO. v. McCANLESS Commissioner of Finance and Taxation, *et al.*

(*Nashville,* December Term, 1945.)

Opinion filed May 4, 1946.

*Appeal dismissed by U. S. Supreme Court, October 14, 1946, 91 L. ed. (adv. ops.), p. 30.

CANADA, RUSSELL & TURNER, of Memphis, for appellant, complainant below.

ROY H. BEELER, Attorney-General, WILLIAM F. BARRY, Solicitor-General, ALLISON B. HUMPHREYS, JR., Assistant-Attorney Gen. and LON P. MACFARLAND, of Columbia, for appellee.

MR. JUSTICE GAILOR delivered the opinion of the Court.

This is a suit by the Gas Company to recover back inspection fees imposed under Code, section 5459, in the sum of $12,540.48 for the three years ending March 31, 1939. After a distress warrant was issued, the inspection fees were paid under protest, and the bill filed on October 2, 1939, for their recovery. The defendant filed an answer. The Gas Company took its proof in May 1940, and after some delay on account of the induction of several state's attorneys into military service, and the desire of the Gas Company to await the outcome of other litigation in which it was involved with the State, the case was set and submitted to the Chancellor on the depositions of complainant and certain additional stipulations of fact. We quote in the course of the opinion some excerpts from these stipulations, but note at the outset, that it was expressly agreed that all of the facts appear-

ing in the following decisions of cases in which the Memphis Natural Gas Company had been a party, shall be treated as part of *complainant's* proof in this cause: *Memphis Nat. Gas Co.* v. *Pope,* 178 Tenn. 580, 161 S. W. (2d) 211; *Memphis Natural Gas Co.* v. *Beeler,* 315 U. S. 649, 62 S. Ct. 857, 86 L. Ed. 1090; *Memphis Nat Gas Co.* v. *McCanless,* 180 Tenn. 688, 177 S. W. (2d) 841; *Memphis Nat. Gas. Co.* v. *McCanless,* 180 Tenn. 695, 177 S. W. (2d) 843. After the chancellor had delivered a careful and comprehensive opinion which is preserved in the record, a decree was entered dismissing the bill, and the complainant, Gas Company, has perfected its appeal to this Court.

In the brief filed by appellant, there is apparently a single assignment of error which fails to conform with Rule 14, 173 Tenn. 873 et seq., in which the action of the chancellor in dismissing the bill, is assailed by the assertion that the Memphis Natural Gas Company was not, during the years in question, (1) a public utility, (2) subject to control of the Railroad and Public Utilities Commission, (3) nor a corporation to which statutes relating to public utilities apply; that therefore, the inspection was both illegal and fictitious and the imposition of the fees therefor, was violative of the rights of the Gas Company under the "due process" (Amendment XIV) and "commerce" (Art. I, sec. 8) clauses of the United States Constitution, and of Art. I, sec. 21, of the Constitution of Tennessee; and that finally, the inspection fee is in effect, a gross receipts tax, not based on costs and expenses incurred by the State, in lawful discharge of its police powers and, therefore, the imposition of this tax on the Gas Company violates the "due process" and "commerce" clauses of the United States Constitution.

We consider first, the contention of the Gas Company that it was not for the three years ending March 31, 1939, a public utility subject to control and regulation by the Public Utilities Commission, nor amenable to statutes applying to public utilities in Tennessee.

Code, section 5448, defines a public utility, for the purpose of control and regulation by the commission, as including common carriers of gas or any other like system, plant or equipment, affected by and dedicated to the public use under privileges, franchises, licenses, or agreements granted by the State or by any political subdivision thereof. During the three years ending April 1, 1939, being those for which the inspection fees have been imposed in this case, the Gas Company had, jointly with the Memphis Power & Light Company, a contract with the City of Memphis to furnish natural gas to all citizens of that municipality. The details and effect of this contract are set out at length in reported decisions, *Memphis Nat. Gas Co. v. Pope,* 178 Tenn. 580, 161 S. W. (2d) 211; *Memphis Natural Gas Co. v. Beeler,* 315 U. S. 649, 62 S. Ct. 857, 86 L. Ed. 1090, which are here to be treated under the stipulation as part of complainant's proof. In the *Pope Case, supra,* 178 Tenn. at page 585, 161 S. W. (2d) at page 212, it is found as a fact:

". . . that the bulk of all complainant's revenues from every source is derived from its business done with and through Memphis Power and Light Company."

During these same three years the Gas Company also had a contract to furnish natural gas to another retail distributing company, the West Tennessee Power & Light Company.

The Gas Company enjoyed privileges and franchises from the City of Memphis (*Pope* and *Beeler Cases, supra*), from seven West Tennessee counties, and various

franchises for rights-of-way over, through and upon state highways from the state highway department.

Pertinent provisions of the Gas Company's charter are:

"The nature of the business of the company and the objects and purposes proposed to be transacted, promoted or carried on by it, are as follows:

"(a) . . . and to carry on all of the businesses that are usual to or may be conveniently carried on *by gas companies or gas pipe line companies.*

"At pages 1 and 2 of said charter, it is provided:

"The nature of the business of the corporation and the objects or purposes to be transacted, promoted or carried on by it are as follows, to wit: . . . (b) . . . to construct and maintain conduits and lines of tubing and pipe for the transportation of gas or oil *for the public generally.* . . ." (Our emphasis.)

During the three years in question, the Company's commercial domicile was in Memphis, where it had offices and kept a crew of employees for operation and maintenance, and the Company was domesticated in the State of Tennessee, to do business here, though it was incorporated under the laws of the State of Delaware. For a disposition of the case on the facts before us, which are undisputed, we find it unnecessary to determine whether powers granted to a corporation by the charter and not exercised, shall, nevertheless, render such corporation a public utility, or whether the character of the corporation shall be determined by the provisions of its charter, and not its exercise of power.

"The answer to that question does not depend upon whether its charter declares it to be a common carrier, nor upon whether the state of incorporation considers it such; but upon what it does." *United States* v. *Brooklyn East-*

*ern District Terminal,* 249 U. S. 296, 304, 39 S. Ct. 283, 285, 63 L. Ed. 613, 616, 6 A. L. R. 527.

"The term 'public use' is a flexible one. It varies and expands with the growing needs of a more complex social order. Many improvements universally recognized as impressed with a public use were nonexistent a few years ago. The possibility of railroads was not dreamed of in a past not very remote, yet, when they came, the courts, recognizing the important part they were to perform in supplying a public want, did not hesitate to take control of them as *quasi* governmental agents, and extend to them the right of eminent domain, in order to equip them thoroughly to discharge the duties to the community which followed their grant of franchises. This is equally true as to other appliances which now form important parts of a rapidly widening system of social and commercial intercommunication. So it may be said at the present time that 'anything which will satisfy a reasonable public demand for public facilities for travel or for transmission of intelligence or commodities' (*In re Stewart* v. *Great Northern Ry. Co.,* [65] Minn. [515], 68 N. W. 208 [33 L. R. A. 427]), and of which the general public, under reasonable regulations, will have a definite and fixed use, independent of the will of the party in whom title is vested, would be a public use. Mills, Em. Dom., Sec. 11." *Ryan* v. *Terminal Co.,* 102 Tenn. 111, 118, 50 S. W. 744, 745, 45 L. R. A. 303.

This exposition of the phrase "public use" by Chief Justice BEARD, has been often quoted and followed in subsequent opinions of this Court. *Great Falls Power Co.* v. *Webb,* 123 Tenn. 584, 590, 133 S. W. 1105; *Tennessee, Coal, Iron & R. Co.* v. *Paint Rock Flume & Transportation Co.,* 128 Tenn. 277, 286, 160 S. W. 522; *State* v. *Union Ry. Co.,* 129 Tenn. 705, 724, 168 S. W. 575, Ann.

Cas. 1915D, 1240; *Webb* v. *Knox Co. Transmission Co.*, 143 Tenn. 423, 434, 225 S. W. 1046; *State ex rel.* v. *City of Memphis*, 147 Tenn. 658, 676, 251 S. W. 46, 27 A. L. R. 1257; *Ferrell* v. *Doak*, 152 Tenn. 88, 90, 275 S. W. 29, 46 A. L. R. 590; *Armstrong* v. *Illinois Cent. R. Co.*, 153 Tenn. 283, 295, 282 S. W. 382; *Knoxville Housing Authority, Inc.*, v. *City of Knoxville*, 174 Tenn. 76, 84, 123 S. W. (2d) 1085.

▮ These same authorities make it abundantly clear that in our decisions the terms *"public use"* and *"public utility"* are synonyms. The statutory definition of Code, Section 5448, determines those public utilities over which the Railroad and Public Utilities Commission is given control and supervision. Here it is necessary for us to determine, in view of the assignment of error, whether the Memphis Natural Gas Company is a public utility, and second, whether it is such public utility as is within the jurisdiction and control of the Commission.

It is not disputed that the sale of natural gas to the ultimate consumer is such an operation as is affected by and dedicated to the public use, nor that in the present case, the Gas Company was operating under privileges and franchises from the City of Memphis, seven West Tennessee counties, and the State of Tennessee through its highway department, and that the scope of the powers granted the corporation in its charter, gave the corporation a right to operate as a public utility. The Gas Company does contend, however, in its supplemental brief, that the franchises, etc., mentioned in Code, Section 5448, are limited to such as are evidenced by what are known as certificates of "convenience and necessity," but we think it is unnecessary for us to settle that issue, since by the unusual way in which this case is presented here for our decision, the question has already been decided for

us by the United States Supreme Court in a suit to determine the liability of the Memphis Natural Gas Company for the Tennessee State Excise Tax:

"Taxpayer's [Memphis Natural Gas Company] contribution to the joint undertaking with the Memphis [Power & Light] company for the distribution of gas to local consumers, and its activities at its Memphis general office in supplying gas to be distributed for the joint account as required by the Memphis company and in safeguarding and securing payment of its share of the profits, *went beyond the mere sale, to a distributor, of gas in interstate commerce. It also constituted participation in the business of distributing the gas to consumers after its delivery into the service pipes of the Memphis company.*" (Our emphasis.) *Memphis Natural Gas Co.* v. *Beeler*, 315 U. S. 649, 656, 62 S. Ct. 857, 862, 86 L. Ed. 1090, 1096, (STONE, C. J.)

We have seen that the charter of the Gas Company gave it power to do business as a public utility and we think this definition of the very operation we are here considering, conclusively determines that the Memphis Natural Gas Company was exercising the power in the three years ending March 31, 1939, and further, under the jurisdictional definition of Code, Section 5448, that it was such utility as was amenable to supervision and control of the State Public Utilities Commission. The same finding by this Court in the *Pope Case, supra,* is merely cumulative. Findings of fact in both these cases are to be given weight here as the Gas Company's own proof.

By simple rules of logic, the decision in the *Beeler Case, supra,* was rendered inevitable by earlier opinions of the United States Supreme Court. *Southern Nat. Gas Corporation* v. *State of Alabama,* 301 U. S. 148, 57 S. Ct. 696,

81 L. Ed. 970; *State of Missouri, ex rel.* v. *Kansas Natural Gas Co.*, 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027; *Lone Star Gas Co.* v. *State of Texas*, 304 U. S. 224, 551, 58 S. Ct. 883, 82 L. Ed. 1304. In the last case, the question was one of the control by the Texas Railroad Commission of a natural gas company piping gas in interstate commerce to retail distributing companies which were affiliates of the natural gas company owning and operating the interstate pipe line. Viewing the sale and distribution of gas under such circumstances as a continuous operation and subject to control by the State Commission, Chief Justice HUGHES said, in delivering the opinion of the Court:

"Thus, the latter companies and appellant are but arms of the same organization doing an intrastate business in Texas and the Commission is entitled to ascertain and determine what was a reasonable charge for the gas supplied through this organization to consumers within the State." *Lone Star Gas Co.* v. *State of Texas,* 304 U. S. 224, 237, 551, 58 S. Ct. 883, 889, 82 L. Ed. 1304, 1313, 1314.

The complete analogy with the case here needs no elaboration.

 Since it is thus established that the Gas Company in the present case was during the three years in question, engaged as a public utility in intrastate operation, there is no basis, whatever, for the argument that state control was precluded by the Federal Natural Gas Act of 1938 15 U. S. C. A., sec. 717a (Federal Utility Regulation, Ann., Vol. 2, p. 639) since such argument has no reasonable basis unless the operation was exclusively interstate. If, for the legality of the levy of the State Excise Tax in the *Beeler Case, supra,* this same operation by the Memphis Natural Gas Company was one in intrastate commerce, as the U. S. Supreme Court in the *Beeler Case* held

it was it is an intrastate operation here, since it is the same operation. The inspection fees here in question, were imposed for three years of that operation.

■■ There have been changes and developments in the Company's method of business since that date, but those changes are not relevant to the inquiry here. The fact that the Company, since the imposition of the inspection fees, has made application and been put under control of the Federal Power Commission, can not affect our decision of this case—on facts occurring before Federal control was effective. Furthermore, Federal control of the natural gas industry as it exists today, is not exclusive of state control but concurrent with it.

"The Federal Power Commission would exercise jurisdiction over matters in interstate and foreign commerce, to the extent defined in the Act, and local matters would be left to the state regulatory bodies. Congress contemplated a harmonious, dual system of regulation of the natural gas industry—federal and state regulatory bodies operating side by side, each active in its own sphere." *Public Utilities Comm.* v. *United Fuel Gas Co.*, 317 U. S. 456, 467, 63 S. Ct. 369, 375, 87 L. Ed. 396, 402, 403.

■ The first three sub-sections of the assignment of error are overruled, and we hold that in its operation during the three years preceding April 1, 1939, the Gas Company was a public utility, subject to reglation and control by the Railroad and Public Utilities Commission, and subject to all statutes of Tennessee having to do with public utilities.

It is next asserted that the inspection fees are an illegal charge since there was, in fact, no inspection; that the amount of the fees was not based on the expense to the State of making such inspections and that in fine, the im-

position 'of the inspection fees is, in reality, the levy of a gross receipts tax. Since these contentions appear in the brief of the Gas Company as further subsections of its single anomalous assignment of error, we discuss them together.

In the first place, we find no justification for limiting the fees imposed here to the idea of inspection merely. The language of Code, sec. 5459, imposing them, is much broader and states the purpose of the charge of these fees to be ''for the inspection, control, and supervision of the business, service, and rates'' of the public utility against which the charge is made.

After providing in succeeding sections for the rate and time of payment of the fees, sec. 5465 provides that the Railroad and Public Utilities Commission shall file with the State Comptroller, a statement showing the fees to be paid by each utility, and that it shall be the duty of the Comptroller to collect said fees and to keep them in a separate account to be known as the ''Public Utility Account,'' and there segregated.

By Section 5468, the purposes for which funds in the Public Utilities Account may be lawfully expended, are set out and defined. These purposes include the employment of experts, engineers, attorneys, accountants and inspectors, whose compensation shall be paid only from the Public Utilities Account. *Cumberland Tel. & Tel. Co.* v. *Railroad & Public Utilities Com'n.,* D. C., 287 F. 406. The fair and only reasonable inference from this legislation is that the legislature intended, by the fees and fines paid into the Public Utilities Account, to create a fund out of which the cost of administering public utilities in Tennessee should be paid, and to provide that the cost of administering such public utilities should be wholly paid by the utilities themselves. There is noth-

ing novel nor revolutionary in this legislative plan for the operation of a special administrative department of the State Government. The same scheme has been in effect for many years in several other departments, notably that of Insurance and of Banking, and it exists to greater or less degree in all departments where the purpose is the regulation of some sort of business or profession by a state board or commission. Provision for the independent support of the board and payment of its operating expenses by the persons or companies affected by its administrative control, have been common legislative formulae in our state government.

In view of the language of one of the stipulations by which the Gas Company agreed ''that the Commissioner might collect the fee if it is decided that the complainant is liable for the fee,'' we have some doubt whether the Gas Company may go farther on this appeal than to secure a determination of liability for the fees under the operation of the Gas Company disclosed by the record. However, as there is a sharp controversy between counsel as to the proper construction of this language of the stipulation, we are unwilling to penalize the Gas Company by enforcing a limit on the scope of the appeal, which the Gas Company asserts that it did not intend to approve.

██ Returning, therefore, to a consideration of the propriety of the fees charged, we think the undisputed evidence of the Gas Company's witness Dearth makes it clear that the commission did make some inspections of the operation and properties of the Gas Company, and since the facts disclosed by the *Beeler* and *Pope Cases, supra,* make out a combined, continuing operation—a joint enterprise of the Gas Company with the Memphis Power & Light Company—we think it wholly reasonable

that fees for "inspection, control and supervision" of the joint operation should be paid by both utilities for the purposes of the "Public Utility Account."

██ Moreover, the burden of showing both that the inspection was a fiction, and that the fees imposed therefor were excessive, was upon the Gas Company asserting those propositions. *McCanless* v. *Southeastern Greyhound Lines,* 178 Tenn. 614, 629, 162 S. W. (2d) 370; *Clark* v. *Paul Gray,* 306 U. S. 583, 59 S. Ct. 744, 83 L. Ed. 1001. As stated, the only evidence on the point, is that of one of the Gas Company's witnesses who testified that inspections were made and there is no evidence, whatever, to support the argument that the fees charged were excessive. On neither point has the Gas Company carried the burden.

██ ██ That natural gas, the commodity here involved, is, because of its explosive and asphyxiating potential, a dangerous instrumentality is too well known to be questioned. Being such, its transportation and distribution fall clearly and necessarily within the scope of the state police power for supervision and control in reasonable protection of the health and safety of the citizen, so that even if the operation of the Gas Company was exclusively interstate, which it was not in the three years preceding April 1, 1939, the State would not be precluded from inspection and control of the Gas Company's operation in the reasonable exercise of its police power. Thornton, Oil & Gas (Willis Ed.) Vol. 3, sec. 795, p. 1099; *McCanless* v. *Southeastern Greyhound Lines, supra; Kelly* v. *State of Washington,* 302 U. S. 1, 58 S. Ct. 87, 82 L. Ed. 3. The constitutional validity of inspection, quarantine, health and other regulations, within the sphere of acknowledged authority of a State, is as clear as the power of Congress to establish regulations of

commerce, notwithstanding that both operate upon the same subject. *Foster* v. *Master & Wardens of Port of New Orleans*, 94 U. S. 246, 24 L. Ed. 122.

"The mere power of the Federal Government to regulate interstate commerce does not disable the States from adopting reasonable measures designed to secure the health and comfort of their people." *Clason* v. *State of Indiana*, 306 U. S. 439, 59 S. Ct. 609, 612, 83 L. Ed. 858. *Parker* v. *Brown*, 317 U. S. 341, 63 S. Ct. 307, 87 L. Ed. 315.

There remains to consider the argument of the Gas Company—that the inspection fees imposed were in reality a gross receipts tax. As stated, these fees are authorized by sections 5459-5465 of the Code of Tennessee. It is true that the amount of the fees is to be "measured by the amount of the gross receipts of each public utility" (sec. 5461), but the fees are to be kept apart and deposited in a "Public Utility Account" (sec. 5465), and from this account only expenses of the administration and supervision of public utilities may be paid. Use of funds in the account is limited to this purpose, and payment of administrative expenses is limited by the amount of this special fund. *Cumberland Tel. & Tel. Co.* v. *Railroad and Public Utilities Comm., supra.* Such a levy is a special assessment for a specific purpose and lacks essential elements of a tax. Cooley Taxation, Vol. 1, sec. 33 *et seq.* Here the legislature decided that gross receipts from business done in the State provided a convenient yardstick for measuring the fair contribution of the public utility to the administrative expense fund. For the same administrative purpose, fees are imposed on banks on the basis of capital investment (sec. 5948), and without further illustrations, though they might be multiplied, we find it true that in no law of this sort, is the

amount of the fee fixed by the actual cost to the State, of regulation, control, or administration of the specific utility or company against which the fee is assessed, but that utilities are required to contribute to the "Public Utility Account" for the administration of all utilities, and banks to the banking department for . the supervision of all banks. The limit is that the expense may not be paid if it is incurred, unless the funds in the specific departmental account are sufficient. Law dictionaries, textbooks and cases from other jurisdictions, make it clear that the essential test to determine whether such fees are, or are not taxes, is whether they are, or are not paid into the general public treasury and disbursable for general public expenses. *Cooley, Taxation, supra; State, ex rel.* v. *Gorman,* 40 Minn. 232, 41 N. W. 948, 2 L. R. A. 701; *Hauser* v. *Miller,* 37 Mont. 22, 94 P. 197.

"A tax is a sum which is required to be paid by the citizen annually for revenue for public purposes." *Mayor and Aldermen* v. *Maberry,* 25 Tenn. 368, 372, GREEN, J.

██ Even if the purpose of the assessment was limited to the exercise of the police power, fees imposed to defray the expenses of that exercise are not objectionable. *State* v. *Bixman,* 162 Mo. 1, 62 S. W. 828.

To be properly defined as "taxes" the fees must be paid into the public treasury as a part of the general revenue and be subject to disbursement for the "general public need." Cf. "tax" and "taxation," Webster's International Dictionary, Black's Law Dictionary, 2 Bouv. Law Dict., Rawle's Third Revision, p. 3220; *Mayor and Aldermen* v. *Maberry, supra.*

For the reasons stated, the assignment of error and its various subdivisions are overruled, and the decree of the chancellor is affirmed at the cost of the appellant.