McCanless *et al. v.* Southeastern Greyhound Lines, Inc., *et al.*

(*Nashville*, December Term, 1941.)

Opinion filed June 2, 1942.

616

Roy H. Beeler, Attorney-General, John Heiskell, Assistant Attorney-General, Thos. H. Peebles, Jr., of Columbia, and Lon P. MacFarland, of Lebanon, for appellant.

W. M. Fuqua and J. Ross Cheshire, Jr., both of Nashville, for appellee.

James W. Wrape and Charles H. Hudson, Jr., both of Memphis, amici curiae.

Mr. Justice Chambliss delivered the opinion of the Court.

In this suit to recover sums paid under protest for interstate permits required by Section 14 of Chapter 119, Acts of 1933, brought into Williams Code as Section 5501.19, the Greyhound Bus Companies challenge the constitutionality of the Act on the ground that it contravenes (1) the commerce clause (Art. 1, sec. 8, cl. 3), and (2) the Fourteenth Amendment of the Federal Constitution. The specific insistence is that (1) the "inspection, control and supervision" provided for by the Act, for which the "permit" charge is made, is a subject fully covered by the Federal Motor Carrier Act of 1935, 49

U. S. C. A., sec. 301 et seq., which it is alleged supersedes and excludes any right of control or supervision by the State over the interstate operation of vehicles; and that (2) the sum exacted for the permits, if justifiable at all as an inspection charge, bears no relation to the service, is not compensatory only, but is arbitrary, discriminatory and excessive. The Chancellor sustained the contentions of the complainant companies and the State has appealed.

The question whether or not the State Motor Act conflicts with, or duplicates the coverage of, the Federal Motor Act of 1935, turns chiefly on the construction of the State Act, a defining of the scope or contemplated coverage of its provisions for "inspection, control and supervision."

The pertinent part of this Section of the Tennessee Motor Act reads as follows: "Every holder of a certificate of convenience and necessity, interstate permit, or contract hauler's permit, shall pay to the State, at such time and in such installments as the Commission may require, a fee for the inspection, control and supervision of the business, equipment serivce [service] or act of such certificate or permit holder; *and to provide a means for the State to exercise its police powers in order to protect the highways and in order to promote the safety of the public by the regulation of the use of the highways.*" (The italicized portion of this quotation was added by amendment in 1941, Pub. Acts 1941, chap. 70, but may be looked to as a legislative declaration of the object of the Act.)

■ ■ That the Congress has authority to regulate interstate transportation and that its authority is exclusive, when and to the extent it is exercised, is settled and

conceded, and is impliedly recognized in the State Motor Carrier Act, in Section 19, which provides that no provisions of the Act "shall be construed to regulate or apply to commerce . . . among the several states . . . except insofar as the same may be permitted under the Constitution of the United States and the Acts of Congress."

Here is a legislative declaration as to the construction to be given this Act, an expression of the intention of the Legislature to authorize only such "inspection, control and supervision" of the operations of complainant Bus Companies in this State as does not conflict with that now covered by the Federal Motor Carrier Act of 1935, and being exercised by the Interstate Commerce Commission.

However, it is also well settled that it is only when Congress has legislated specifically touching a given subject, that the State's power to legislate touching the same subject is superseded. And, as was said by MR. JUSTICE STONE, speaking for an undivided Court, in the recent case of *Maurer* v. *Hamilton*, 309 U. S., 598, 60 S. Ct., 726, 734, 84 L. Ed., 969, 135 A. L. R., 1347, "As a matter of statutory construction Congressional intention to displace local laws in the exercise of its commerce power is not, in general, to be inferred unless clearly indicated by those considerations which are persuasive of the statutory purpose. This is especially the case when public safety and health [the field in which we construe the instant legislation to operate] are concerned. *Kelly* v. *Washington*, 302 U. S., 1, 10-14, 58 S. Ct., 87, 92, 94, 82 L. Ed., 3 [10-13] ; *H. P. Welch Co.* v. *New Hampshire*, 306 U. S., 79, 85, 59 S. Ct., 438, 441, 83 L. Ed., 500 [505], and cases cited."

■ It must be conceded that, independent of the alleged application of the doctrine of supersedure, the State has broad police powers of supervision and control to promote safety and convenience in the use and conservation of its highways. And that these powers extend, in the absence of congressional conflicting action, to the use of its highways by vehicles engaged in interstate commerce, or transportation, has recently been reaffirmed in *South Carolina State Highway Department* v. *Barnwell Bros.*, 303 U. S., 177, 625, 58 S. Ct., 510, 82 L. Ed., 734, cited and approved in *Maurer* v. *Hamilton, supra.*

■ So that, bearing in mind the legislative disavowal of intention by anything in the Act to invade congressionally covered domain, we come back to the determinative question, whether or not the challenged provisions requiring a permit and payment of an inspection fee do intrench upon the field now exclusively occupied by the Interstate Commerce Commission, administrators of the Federal Motor Act.

We inquire, first, what powers incident to the ''inspection,'' to which this ''permit'' may be referred, have been left to the State by the action of Congress and its agency, the Interstate Commerce Commission? Certainly the entire field has not been exclusively taken over by the Federal Act and its amendments. For example, inspection of vehicles moving interstate, for the purpose of appraising their weight and size, is left to the State, as held in *Maurer* v. *Hamilton, supra.* If it be conceded that inspection of the ''equipment'' of the vehicles is for the Federal authorities, the State authorities may inspect these vehicles to determine their fitness for use on the several highways, varying, as these ways do, in width and structure, with their bridges and tunnels of

differing dimensions and capacities. And these permits are issued to the holders of certificates of necessity and convenience as authority to operate vehicles of given type over designated and prescribed routes, as an incident of the right also reserved to the State to minimize traffic congestion, as well as to confine them to routes of most suitable construction, all within the police power to supervise and control use of the State highways for the protection of the public from those hazards to persons and property inherently incident to the operation of motor vehicles, known to common experience and judicially recognized. See *Hess* v. *Pawloski*, 274 U. S., 352, 356, 47 S. Ct., 632, 71 L. Ed., 1091, 1094. Before issuing such certificates and permits the State Utilities Commission "inspects" the vehicles proposed for operation, taking into consideration the schedules to be followed, including elements of frequency and speed, comparative congestion and obstruction and relative inconvenience to other and general use of the particular route. Whether a given highway is built to accommodate safely and stand up under vehicles of certain sizes and weights, and operated with a given frequency, is a matter requiring "inspection" and determination by the State Commission, as an incident of the issuance of its permits. *Maurer* v. *Hamilton*, *supra*, would seem, in principle, to sustain the holding in earlier cases, prior to the Federal Motor Act, that, "The state may exclude from the public highways vehicles engaged exclusively in interstate commerce, if of a size deemed dangerous to the public safety," and "safety may require that no additional vehicle be admitted to the highway. The Commerce Clause is not violated by denial of the certificate [or permit] . . . if upon adequate evidence denial is deemed necessary to

promote the public safety." *Bradley* v. *Pub. Utilities Commission*, 289 U. S., 92, 53 S. Ct., 577, 579, 77 L. Ed., 1053, 85 A. L. R., 1131.

The permit issued, it becomes the duty of inspectors employed directly by the Commission, and of the Highway Patrol officers otherwise employed by the State, to inspect, control and supervise the vehicles operated from day to day over its highways and see to it that they conform to and are operated in accordance with the limitations prescribed. Such "control" as is incident to the enforcement of such regulations may certainly be exercised by the State from day to day, either through "inspectors" employed by the Commission, or other State employed traffic officers.

Again, constant, daily and hourly, "inspection" and "supervision," within the contemplation of this State Act, is required to be given these interstate vehicles as they pass over the State highways, by the police and Highway Patrol officers, who are empowered to see that speed limits are observed, through school and other special zones fixed by State statutes, in passing intersections and traffic lights, over hills and along curves, where traffic is regulated and restricted by law, and, in general, to enforce observance of the various provisions of the State laws.

And yet again, the "inspection" and "supervision" contemplated calls for constant examination of the stations used by the complainant companies, including their toilet facilities, for the protection of the health and safety of the public. Overcrowded and ill kept, such places may well become breeding places of disease. These are not details of "operation and equipment," over which it may be reasonably contended the Federal Act

and the regulations of the Interstate Commerce Commission contemplate control.

We construe the State Motor Control Act before us, providing for an interstate permit to holders of certificates of convenience and necessity, as requiring payment of a fee for inspection, control and supervision, in the respects and particulars before mentioned, and perhaps others not enumerated, but all subject to the express provision of the State Act that it shall have effect only ''in so far as the same may be permitted under the Constitution of the United States and the Acts of Congress,'' that is, only in so far as the Congress has not authorized and through its agency assumed control and supervision.

In a helpful *amicus curiae* brief, filed on behalf of appellee Bus Companies, we 'find, and append to this opinion, a comparative analysis of the Rules and Regulations of the State and Interstate Commerce Commissions, set forth in parallel columns.

Having in mind that the State Commission deals with both intrastate and interstate operations, and that its Rules and Regulations apply to both, we are of opinion that all of the matters mentioned in these subdivisions lettered (a) to (g) and numbered I to V, inclusive, relate and are to be referred to the intrastate operations over which the State Commission has conceded control. So viewed and applied, there is no encroachment upon the Interstate Commerce Commission's field of control and conflict is avoided. The only terminology appearing in the Federal Rules column which unexplained might indicate duplication, is found in the paragraph reading ''Part 6.—Inspection and maintenance.'' No corresponding ''Part 6'' appears in the State column of Regulations. The Section 14 of the State Act under consideration,

dealing with interstate operations, does provide for "inspection." But this apparent conflict is apparent only, not real, when proper construction is given. "Inspection and maintenance" are related in fact, as well as coupled in form. We think "inspection" here used refers to maintenance, meaning inspection with a view to proper maintenance of the vehicle. Now the "inspection" contemplated by the use of the term in this Section 14 of the State Act is of a different character, and is to be made for a distinct purpose, heretofore outlined in this opinion. It relates, among other matters, as we have pointed out, to examination for the purpose of appraising weights and dimensions, and consequent adaptability to given highways and conditions of traffic, use and congestion, affecting public safety and the conservation of highways owned by the State. Also, inspection, control and supervision by State policing authorities incident to speed and other traffic features in restricted areas and under various conditions. It will be observed that Federal Rules and Regulations do not purport to deal with these and other features which might be mentioned, which require and receive constant supervision by the State.

That permits may be required of interstate carriers over State highways, and incidental inspection, control and supervision may be exercised for the purposes indicated, and which we hold this State Act to contemplate; and that the Federal Motor Act of 1935 does not exclude the exercise by the State Commission of this nature of supervision and control, seems to have been definitely indicated by the Federal Courts and some respectable State authority. *Thompson* v. *McDonald*, 5 Cir., 1938, 95 F. (2d), 937; *South Carolina State Highway Department* v. *Barnwell Bros.*, 1938, 303 U. S., 177, 625, 58 S. Ct.;

510, 82 L. Ed., 734; *Kelly* v. *Washington,* 1937, 302 U. S., 1, 58 S. Ct., 87, 82 L. Ed., 3; *Maurer* v. *Hamilton,* 1940, 309 U. S., 598, 60 S. Ct., 726, 84 L. Ed., 969, 135 A. L. R., 1347; *Ex parte Truelock,* 1940, 139 Tex. Cr. R., 365, 140 S. W. (2d),·167; *Railroad Comm.* v. *Southwestern Grey-hound Lines,* Tex. Civ. App., 1936, 92 S. W. (2d), 296; *Sharp* v. *Barnhart,* 7 Cir., 1941, 117 F. (2d), 604, certiorari denied *Canterbury* v. *Barnhart,* 313 U. S., 576, 61 S. Ct., 1099, 85 L. Ed., 1533, 1534; *Lowe* v. *Stoutamire,* 723 Fla., 135, 166 So. 310, 311, and *H. P. Welch & Co.* v. *New Hampshire,* 306 U. S., 79, 59 S. Ct., 438, 441, 83 L. Ed., 500.

Mention has been made of several of these cases, but some further references are appropriate. Directly in point is this excerpt from the recent opinion in *H. P. Welch & Co.* v. *New Hampshire, supra*: "The roads belong to the State. There is need of local supervision of operation of motor vehicles to prevent collisions, to safeguard pedestrians, and the like. . . . In view of the efforts of governmental authorities everywhere to mitigate the destruction of life, limb and property resulting from the use of motor vehicles, it cannot be inferred that Congress intended to supersede any state safety measure prior to the taking effect of a federal measure found suitable to put in its place. Its purpose to displace the local law must be definitely expressed."

The opinion in this case closes with this emphatic language: "Plainly Congress by mere grant of power to the Interstate Commerce Commission did not intend to supersede state police regulations established for the protection of the public using state highways."

In the late leading case of *South Carolina State High-way Department* v. *Barnwell Bros., supra,* MR. JUSTICE STONE, after emphasizing that discrimination against

Interstate Commerce is prohibited, declares that: "A state can, if it sees fit, build and maintain its own highways . . . and in the absence of congressional action their regulation is peculiarly within the competence of the state, *even though interstate commerce is materially affected.*" (Italics ours.) And he adds this recognition of the principle here involved: "A state may impose nondiscriminatory restrictions with respect to the character of motor vehicles moving in interstate commerce as a safety measure and as a means of securing the economical use of its highways."

And in a still later opinion (*Maurer v. Hamilton, supra*) MR. JUSTICE STONE thus restated this principle: "This Court has also had occasion to point out that the sizes and weights of automobiles have an important relation to *the safe and convenient use of the highways, which are matters of state control. Sproles v. Binford,* 286 U. S., 374, 52 S. Ct., 581, 76 L. Ed., 1167; *South Carolina State Highway Department v. Barnwell Bros., supra.*"

Finally, in *Kelly v. Washington, supra* [302 U. S., 1, 58 S. Ct., 88, 82 L. Ed., 3], the late Chief Justice gave strong expression to these views. We quote from headnotes, which are substantially in the language of the opinion:

"There necessarily remains to the state, until Congress acts, a wide range for the permissible exercise of powers appropriate to their territorial jurisdiction, although interstate commerce may be affected."

"The exercise by the state of its police power . . . is superseded only where the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together."

"The principle that the state may act when Congress in regulating interstate commerce has occupied only a limited field is not limited to cases in which the state exercises its power to protect the lives and the health of its people, but extends to . . . more general purposes."

Among the cases above cited is *Thompson* v. *McDonald*, 5 Cir., 95 F. (2d), 937. In a "reply brief" of *amicus curiae* it is noted that this case was reviewed on *certiorari* by the United States Supreme Court and reliance on this authority by counsel for the State is questioned because the Supreme Court disposed of the case without passing on the question of supersedure. In reponse, counsel for the State have this to say, which we approve:

"In the original brief we inadvertently failed to point out that the case of *Thompson* v. *McDonald*, 5 Cir., 95 F. (2d), 937, cited and relied on therein, had been reviewed on certiorari by the Supreme Court of the United States and affirmed as *McDonald* v. *Thompson*, 305 U. S., 263, 59 S. Ct., 176, 83 L. Ed., 164. The omission is pointed out by *amicus curiae* in its reply brief at page 23 where it insists that the case as affirmed by the Supreme Court is not authority for the State's position in this case

"In affirming the case the Supreme Court did not deal with the question of supersedure, but neither did it take exception to the reasoning of the Circuit Court of Appeals on that question. We find also that the Circuit Court of Appeals opinion has, even since the Supreme Court opinion, been cited and relied on as authority on the question here in point by both Federal and State courts. *Cochran* v. *M. & M. Transp. Co.*, 1 Cir., 112 F. (2d), 241; *R. R. Commission* v. *A. E. McDonald, etc.* [*Freight Lines*] (Tex. Civ. App.), 127 S. W. (2d), 932;

*A. E. McDonald, etc. [Freight Lines]* v. *United States,* (D. C. Tex.), 35 F. Supp., 132.

. . . . .

"The Circuit Court of Appeals opinion was also cited and quoted as authority by the Supreme Court of Pennsylvania in the case of *Maurer* v. *Boardman,* 336 Pa., 17, 7 A. (2d), 466, which case was later affirmed by the Supreme Court of the United States as *Maurer* v. *Hamilton,* 309 U. S., 598, 60 S. Ct., 726, 84 L. Ed., 969 [135 A. L. R., 1347], which decision we refer to in detail at page 52 of the State's original brief."

 We come now to the second ground of attack, the insistence that the charge made for the "inspection" is not compensatory merely, but so excessive and out of proportion to the service rendered that it is, in effect, a revenue measure, under the guise of an inspection fee, and is a burden on interstate commerce and violative of the Fourteenth Amendment. The theory advanced is that, conceding that an "inspection" is permissible and may be charged for, the charge must be limited to this specific service—in a narrow sense of the term—and must be restricted to compensation therefor only.

In the first place, as we have indicated, the permit for which the charge is made under this Act covers, not only such an "inspection," but embraces important elements of control and supervision. When the basis for the charge made is thus broadened, the justification for it is apparent. So viewed, we are not impressed by the argument that the presumption which applies in favor of the reasonableness of the charge made for the service has been overcome by the complainants. Apparently relying chiefly on the contention (1) that the State is without power to collect any charge at all, and (2) that, if any,

then for strictly "inspection" only, and that in this view the charge made is so manifestly excessive as to shift the burden to the State of justifying it, little proof and no effective argument is presented for complainant to sustain the claim that the charge is excessive. The charge of $2.50 per bus seat is approximately $84 for "inspection, control and supervision" of a motor bus for a year, that is, $7 a month, or 23 cents a day.

There is no discrimination shown against interstate busses, all busses intrastate and interstate are charged alike. Some make short hauls and others long, but those that make short runs, make them more frequently, and thus equalize the use of the highways and the supervising service required. When all the elements of service to which we have pointed are considered, required to be rendered by the various State agencies more or less so engaged, we cannot say that this fee is on its face excessive and unreasonable. It is common knowledge, and may be gathered from this record, that each of these large busses travels at high speed many thousands of miles each month over these State roads, carrying thousands of passengers and yielding gross revenue of thousands of dollars. While no definite figures are shown, it is quite apparent that this fee of $7 a month is but a very small fractional percentage of the monthly collections from each motor bus.

The only witness testifying on the question of the relation of the charge to the service of inspection, supervision and control is Stanley White, auditor of the State Commission, called as a witness by complainants. His testimony does not sustain the allegations of the bill, but to the contrary. He testifies that he suggested the rate of $2.50 per seat as reasonably calculated to yield a sum sufficient, and no more, to compensate for the service

required; that this estimate was based on his study as auditor of the Commission's records and past experience; that this basis had been newly adopted and first applied for the year 1939, herein involved, and that he was not of opinion that the yield was proving to be disproportionate to the cost, when the various factors he enumerated were considered. White shows that in 1939 approximately $48,000 was collected for this service from motor bus operations; that these collections are made through the Finance and Taxation Department, the expense incident thereto being borne by that agency; that the collections go into the State treasury, and therefrom appropriations are made to the State Commission to defray its expenses. No proof was offered of the cost of the inspection, supervision and control of a bus, or of all the busses paying this fee, the position of complainants being, as above suggested, that the burden was upon the State to show that the charge was reasonable. Counsel invoke the rule that, (1) where the charge is prima facie excessive, or (2) when the collections for inspection are commingled with the general funds of the State, the burden of justifying the charge is on the State. The holding in *Great Northern Railway Co.* v. *Washington*, 300 U. S. 154, 57 S. Ct., 397, 400, 81 L. Ed., 573, is invoked.

It is true that on the facts appearing in that case it was held that the burden of showing that the charge exacted was not excessive was on the State. It was found that on the face of the Act the exaction was clearly excessive, much beyond the cost of the inspection for which it purported to be laid, and was made for other expenses, and it was held that, "If the exaction be so unreasonable and disproportionate to the service as to impugn the good faith of the law it cannot stand either under the commerce clause or the Fourteenth Amendment."

It is to be observed that, even on the facts of that case, the Court sharply divided in holding the burden to be upon the state. In the minority opinion, written by Mr. Justice CARDOZO and concurred in by Chief Justice HUGHES, and Justices STONE and BRANDEIS, it was said: "The taxpayer may not rest upon a showing of possible overpayment. There must be a showing of an overpayment not merely possible but actual, and one substantial in amount. . . . To hold otherwise would be to go counter to the settled rule that 'one who would strike down a state statute as obnoxious to the Federal Constitution must show that the alleged unconstitutional feature injures him.'

In a later decision, in *Clark* v. *Paul Gray, Inc.*, 306 U. S., 583, 59 S. Ct., 744, 753, 83 L. Ed., 1001, the Court, in a unanimous opinion, upheld the above reasoning of Mr. Justice CARDOZO. The rule which we now follow was thus stated in a headnote:

"Persons attacking the validity of a statute imposing license fees have the burden of proof to show that the fees are excessive for the purposes declared in the statute."

The opinion reads:

"Appellees have offered no proof that either of the fees is too large, although the burden rested upon them to show that the fees were excessive for the declared purposes." It is further said:

"The state is not required to compute with mathematical precision the cost to it of the services necessitated by the caravan traffic. If the fees charged do not appear to be manifestly disproportionate to the services rendered, we cannot say from our own knowledge or experience that they are excessive."

Note the language above quoted, ''excessive for the purposes declared in the statute,'' and bear in mind that we have construed this statute as declaring a purpose to exact this challenged charge not only for ''inspection'' strictly considered, as contended by appellants, but for supervision and control in the regards and particulars we have defined. Indeed, as above intimated, we apprehend that if this statute be construed to embrace not only ''inspection,'' but the supervision and control described, and if a charge for such purposes may be exacted by the State without infringement on the authority being exercised by the Federal Commission, as we hold, then the argument that the charge is excessive falls of its own weight.

 In a supplemental brief of *amicus curiae*, filed since the preparation of the foregoing opinion, the argument is for the first time submitted that the State Act under consideration confers authority upon the State Commission to regulate ''only the commercial features of motor carrier operations,'' as distinguished from ''physical over-the-road operations,'' that is, regulations controlling traffic on the highways, speed, weight and sizes of vehicles, and other matters pertaining to the preservation of the highways and the safety of the public. It is argued that the State Act confers on the Commission authority only to regulate the ''business or commercial'' features of motor carriers, and citation is made of certain provisions of the Act (quite apparently applicable to intrastate operations as to which the State Commission acts exclusively) which empower the Commission to fix or approve rates and fares and fix schedules and require accounts to be kept and reports made, etc. What we have said in the foregoing opinion as to the purpose and scope

of the Act responds in general to this belatedly made argument. However, a re-examination of the Act satisfies us that ample authority is conferred upon the State Commission to exercise the power of inspection, supervision and control for which the charge under consideration is laid. We need go no further than refer to Section 21 of Chapter 119 of the Acts of 1933 (Williams' Code, Section 5501.1-5501.23), wherein it is declared to be the purpose of the legislation to confer on the Railroad and Public Utilities Commission power to supervise and regulate transportation "over or upon the public highways of this State," and to "(2) relieve existing and future undue burdens upon the highways arising by reason of their use by motor vehicles, (3) protect the welfare and safety of the traveling and shipping public in their use of the highways," and, finally, to "(4) protect the property of the State in its highways from unreasonable, improper, or excessive use." Authority could scarcely have been more directly and comprehensively conferred to exercise that "inspection, control and supervision" which the charge herein considered is laid to compensate for.

It results that the decree of the Chancellor is reversed and the suit dismissed.

## Rules and Regulations Prescribed and Adopted By the Railroad and Public Utilities Commission and By the Interstate Commerce Commission.

Tennessee Rules and Regulations

Order of the Commission adopting rules of procedure and practice before the Commission— Order of August 2, 1939, and supplemental order of October 24, 1939.

Federal Rules and Regulations

Rules of practice in effect many years, revised April 1, 1936. Special instructions governing proceedings under the Motor Carrier Act adopted May 31, 1938.

Rules and regulations effective August 15, 1935, governing—

(a) Certificates of convenience and necessity. Sec. 1.

(b) Freight tariffs—requiring them to be filed. No attempt was here made to regulate charges. Sec. 2, Rules 10 and 12.
1. Charges in tariffs—Rule 13.

(c) Insurance or surety bonds and requiring carriers to file them.

(d) Requirements for equipment of motor vehicles. Sec. 5.

(e) Rules governing the operation of motor vehicles. Sec. 6.

(f) Rules regulating books of accounts and records to be kept.

(g) By general order of October 6, 1936, effective February 15, 1937, new rules and regulations were made governing the filing and approval of insurance policies and surety bonds. These rules were made to take the place of those of August 15, 1935.

Part I—Qualifications of Drivers.
Part II—Driving of Motor Vehicles.
Part III—Parts and Accessories necessary for State Operation.
Part IV—Reporting of Accidents.
Part V—Miscellaneous Rules.

Rules and Regulations relating to:

(a) Forms of certificates of convenience and necessity. Order of October 28, 1935.

(b) Forms for grandfather applications by order of October 8, 1935.

(c) Transfer of operating rights —order of September 1, 1938.

(d) Designation of agent for service of process—Act Par. 221.

(e) Rules governing tariffs—Tariff circular MF No. 1—Effective January 8, 1936. Changes and Notice Rule 5.

(f) Rules governing insurance and surety bonds—order effective February 15, 1937.

(g) Rules governing accounts to be kept and reports to be made.

Part 1.—Qualifications of Drivers.
Part 2.—Driving of Motor Vehicles.
Part. 3.—Parts and Accessories Necessary for Safe Operation.
Part 4.—Reporting of Accidents.
Part 5.—Hours of Service of Drivers.
Part 6.—Inspection and Maintenance.