M.H.S. COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M. H. S. Co. v. Commissioner
Docket No. 1299-74.
United States Tax Court
T.C. Memo 1976-165; 1976 Tax Ct. Memo LEXIS 238; 35 T.C.M. (CCH) 733; T.C.M. (RIA) 760165; May 25, 1976, Filed Lewis R. Donelson and Boyd L. Rhodes, Jr., for the petitioner. John B. Harper and Jack D. Yarbrough, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent has determined deficiencies in the Federal income tax of petitioner M.H.S. Company, Inc. for its taxable years ended September 30, 1966, 1967, 1969 and 1970 in the amounts of $19,444.52, $62.13, $996.50 and $977.16, respectively. The issue for decision is whether petitioner's investment of the proceeds it received upon the condemnation of real property held by it for productive use in a trade or business or for investment satisfied the requirements of section 1033, I.R.C. 1954, [1] so as to entitle petitioner to nonrecognition of the gain realized upon the conversion of the property. FINDINGS *241 OF FACT M.H.S. Company, Inc. (M.H.S.), a Tennessee corporation, with its principal place of business at Memphis, Tennessee at the time of the filing of its petition in this case, filed its Federal corporate income tax return (Form 1120) for its fiscal year ended September 30, 1966 with the District Director of Internal Revenue at Nashville, Tennessee. Its Federal corporate income tax returns for its fiscal years ended September 30, 1967, 1969 and 1970 were filed with the Director, Internal Revenue Service Center at Chamblee, Georgia. M.H.S., upon its incorporation under the laws of the State of Tennessee on October 1, 1956, adopted a fiscal year ending September 30 as its taxable year. During the years in issue the outstanding stock of petitioner was owned equally by Dr. Justin H. Adler and his wife, Mrs. Herta A. Adler. Dr. Adler is president of petitioner and Mrs. Adler is secretary. Dr. Adler, Mrs. Adler and their daughter, Hedda, constitute the members of the board of directors of M.H.S. M.H.S. was formed for the purpose of acquiring and leasing real estate. Prior to 1966 the principal assets of the corporation consisted of three parcels of real estate situated in the *242 Memphis area. Two tracts of the real property owned by petitioner, one located at 48 North Waldran Street and the other at 1133 Poplar Avenue, were each improved. The property located on Polar Avenue was leased to the Adler Nursing Home and the apartment building on the North Waldran property was rented to employees of the nursing home and other individuals. The tracts of land and the improvements thereon were real property held by petitioner for productive use in a trade or business or for investment. During 1965 the properties located at 48 North Waldran and 1133 Poplar Avenue were condemned by the State of Tennessee to permit the construction of an interstate highway. During its taxable year ended September 30, 1966, petitioner received a condemnation award from the State of Tennessee for the North Waldran and Poplar Avenue properties totaling $124,826.82. [2]
At the time *243 petitioner received the award in 1966, its adjusted basis in the above two parcels of real estate was $47,048.72. The proceeds received from the condemnation award exceeded petitioner's adjusted basis in the properties in the amount of $77,778.10 for the fiscal year ended September 30, 1966. Petitioner contested the amount of the award received. In its fiscal year 1969 petitioner accepted in settlement of this contest an additional award from the State of Tennessee totaling $14,500. Petitioner incurred legal fees in obtaining recovery of the additional award in the amount of $7,048.40 leaving an additional net realized gain of $7,451.60 for its 1969 fiscal year. [3]
On Schedule D of petitioner's corporate income tax return filed for its fiscal year ended September 30, 1966, an election was made to not recognize gain upon the receipt of the condemnation proceeds with the following notation: "Involuntary conversion - Money to be reinvested." Upon receipt of the condemnation award in 1966, M.H.S. placed the proceeds in a savings account until a suitable investment *244 could be located. Dr. Adler, as president of M.H.S., contacted Mrs. Libby Adler, a relative who is a realtor, for the purpose of soliciting her aid in finding acceptable reinvestment property. Mrs. Adler, in turn, contacted Mr. Jerry Frager, another realtor, who had experience with commercial property. Mr. Frager had as clients Mr. Irving Evans and Mr. Nate Evans (hereinafter referred to as "the Evans"), partners in a business known as Evans Grading Company. On January 21, 1965, the Evans had contracted to purchase from the Memphis Housing Authority a parcel of realty which had been acquired by the Authority as urban renewal property. The parcel consisted of approximately 2-1/2 acres of vacant land bordering on two major streets. Pursuant to the contract the Evans were required to offer a plan to redevelop the land in accordance with the urban renewal plan in a manner acceptable to the Memphis Housing Authority. Under this contract they were required within a specified time to present final plans and specifications of their proposed improvements and to submit evidence satisfactory to the Housing Authority that they had sufficient equity capital and the financing necessary *245 for the construction of the proposed improvements. The sale price of the real property was stated to be $292,725 with the amount to be adjusted at the rate of $2.50 per square foot if the land area was found to differ from that estimated upon a final survey. [4]The Evans were required to give a downpayment of $29,272.50, one-half of the amount to be applied to the purchase price upon delivery of a warranty deed and one-half to be held by the Housing Authority as a security deposit to guarantee construction of the improvements. The contract contained a provision prohibiting the assignment by the purchaser of his rights under the contract without the written approval of the Memphis Housing Authority. Because the Evans were having problems securing the necessary financing to complete the proposed improvements, they began seeking a purchaser to whom to assign their interests under the contract or a financial partner to participate in the purchase. The Evans had made an unsuccessful attempt to obtain financing from local mortgage bankers for the purpose of constructing an office building. Mr. Frager *246 placed the Evans in contact with Dr. Adler since he felt that M.H.S. might be interested in the prospects of development of this particular parcel of land. Thereafter, Mr. Evans and Dr. Adler entered discussions with respect to the land held by the Evans under the contract for sale. The Evans offered to assign the entire interest in the property under the contract to M.H.S. However, the officers of M.H.S. decided that they would prefer to have the participation in the development of the property of persons who had prior experience in real estate development. The Evans were experienced real estate developers. A special meeting of the Board of Directors of M.H.S. was held on January 10, 1967. The minutes of that meeting are as follows: The President discussed and reviewed the rather lengthy negotiation which had been conducted with Evans Grading Company as represented by Mr. Nate Evans and Mr. Irving Evans. It was proposed that the corporation purchase an interest in a tract of land located between Poplar Avenue (on the North), Pauline Street (on the South), the new Kennedy Veterans Administration Hospital (on the East), and the Phillipps '66 Service Station (on the West). *247 This area comprises approximately 117,090 square feet and is presently owned by the Memphis Housing Authority in connection with the Medical Center Urban Renewal redevelopment. Evans Grading Company is willing to sell a one-half (1/2) interest in this property to the corporation for $75,000.00 provided that the corporation lend an additional $100,000.00 to assist in financing the proposed improvements thereon. The President pointed out that the corporation's property at Poplar Avenue and Waldran Street, in Memphis, Tennessee, had been condemned in connection with the Federal Expressway Program and that the corporation was under the law permitted to reinvest the proceeds of this sale and postpone the gain which would have been recognized as a result of the original condemnation. It was unanimously agreed that the Evans' proposal is a prospectively favorable business venture. The President was authorized to conduct further negotiations and to obtain the services of Mr. Lewis R. Donelson, III., as attorney for the corporation, both for clarification of tax requirement, as well as to represent the corporation in the above Joint-Venture Agreement. The President was also authorized *248 to negotiate loans from banks as well as other sources to complement the cash resources of the corporation. The amount of this investment would be well in excess of the remaining funds which the corporation has to reinvest from the condemnation. * * *
On February 10, 1967, another special meeting of the Board of Directors of M.H.S. was held. The pertinent parts of the minutes of that meeting are as follows: The President stated that the purpose of the meeting was to authorize the President and the Secretary of the corporation to execute an assignment or ratification of the transfer of the leases executed between Evans Construction Company and/or Irving and Nate Evans and Texaco, Inc., Loeb's Barbeque, Model Bluff City Laundry Cleaner, Inc., Jo Royce Gaia and The International House of Pancakes of Tennessee, Inc. to the joint venture composed of Irving Evans, Nate Evans and M.H.S. Company, Inc., a Tennessee corporation along with a ratification of the transfer of the Poplar Street property to the said joint venture. After thorough discussion of the matter and upon motion duly made and seconded, the following resolutions were unanimously approved: BE IT RESOLVED that the *249 President, Justin H. Adler, and the Secretary, Herta A. Adler, be and they are hereby authorized to execute on behalf of M.H.S. Company, Inc. the assignment from Irving Evans and Nate Evans and/or Evans Grading Company all of the right, title and interest in and to that certain lease number G-77A dated March 8, 1967, with Texaco, Inc., a memorandum of which is recorded in Lease Book 99, Pages 217 and 218 of the Register's Office of Shelby County, Tennessee, to the joint venture composed of Irving Evans, Nate Evans and M.H.S. Company, Inc., a Tennessee corporation. BE IT FURTHER RESOLVED that the said President and Secretary of the company be and they are hereby authorized to execute on behalf of the company a ratification and/or assignment of the transfer of the fee title and all other existing leases of the Poplar Street property to the joint venture composed of Irving Evans, Nate Evans and M.H.S. Company, Inc., a Tennessee corporation. BE IT FURTHER RESOLVED that the said President and Secretary be and they are hereby authorized to execute on behalf of the corporation such other papers and documents as shall be necessary to properly consummate the transfer and assignment of *250 the leases of the Poplar Street property to the joint venture and further to execute any other such papers and documents as shall be necessary to consummate the financing, leasing and other operation of the said property. * * *
On February 22, 1967, another special meeting of the Board of Directors of M.H.S. was held. The pertinent parts of the minutes of this meeting are as follows: The President reported on the completion of the negotiations with Evans Grading Company for the purchase of a Fifty (50%) Percent interest in the Medical Center Urban Renewal property between Poplar and Pauline Streets in Memphis, Tennessee. He stated that an agreement had been reached for the corporation to purchase a one-half (1/2) interest in this property for $75,000.00. He explained that a permanent loan had been arranged through Percy Galbreath & Son to erect improvements on the property in accordance with previously prepared plans and that some leases had been obtained for the proposed rental properties to commence promptly upon their completion. He further stated that the corporation had been advised by Lewis R. Donelson, III, Attorney at Law, that this reinvestment of the proceeds *251 of the condemnation would be proper under the terms of the Internal Revenue Code. Since the amount of investment in this project will exceed the amount received by the corporation from its property on Poplar and Waldran Streets in Memphis, Tennessee, no gain could be recognized on the proceeds reinvested from such condemnation. The President further stated that there had been prepared a Joint-Venture Agreement evidencing the understanding of the Evans Grading Company and the corporation as to the proposed development and operation of the property at Poplar and Pauline Streets in Memphis, Tennessee. He recommended that both these contracts be approved whereupon the following motion was duly made, seconded and unanimously adopted: WHEREAS, the corporation has received certain proceeds from the condemnation of the property at Poplar and Waldran Streets, in Memphis, Tennessee, and is desirous of reinvesting the same within the terms of the Internal Revenue Code; and WHEREAS, the corporation has an opportunity to purchase a Fifty (50%) Percent interest in certain property located between Poplar and Pauline Streets in Memphis, Tennessee, in the Medical Center Urban Renewal redevelopment. *252 BE IT THEREFORE RESOLVED, that the officers of the corporation be and the same are hereby authorized and empowered to execute the necessary contracts and other documents as might be necessary to accomplish to [sic] purchase of a Fifty (50%) Percent interest in the property located in the Medical Center Urban Renewal area bounded on the North by Poplar Avenue, the South by Pauline Street, the East by the new Kennedy Veterans Administration Hospital, and on the West by the Phillipps '66 Service Station, and comprising approximately 117,090 square feet, and to pay therefor the sum of $175,000.00 of which $75,000.00 will be in the form of a permanent investment and $100,000.00 in the form of a loan to be used in connection with the development of the property. BE IT FURTHER RESOLVED, that the officers of the corporation be and the same are hereby authorized and empowered to execute the Joint-Venture Agreement with Evans Grading Company covering the terms agreed upon for the development and operation of the aforesaid property. The President stated that a meeting had been set up for February 23, 1967, in the offices of Lewis R. Donelson, III, Attorney at Law, Suite 2020, First *253 National Bank Building, Memphis, Tennessee, to sign the contract covering the terms of the development and the operation of the property and that the formal closing for the purchase of the property would be arranged within the next few weeks. No further business was brought up. On February 23, 1967, petitioner and the Evans entered into an agreement dated February 14, 1967, which was entitled "Joint Venture Agreement" and provided as follows: THIS AGREEMENT, made and entered into on this the 14th day of February, 1967, by and between M.H.S. COMPANY, INC., hereinafter referred to as "M.H.S", and EVANS GRADING COMPANY, a Partnership composed of IRVING EVANS and NATE EVANS, hereinafter referred to as "EVANS", WHEREAS, EVANS has heretofore on January 21, 1965, entered into contract with the Memphis Housing Authority for the purpchae by said EVANS of a tract of land in Memphis, Tennessee bounded on the north by Poplar Avenue and on the south by Pauline Street, * * * and WHEREAS, EVANS has had prepared and approved by the Memphis and Shelby County Planning Commission a plan of subdivision to be known as Poplar-Pauline Commercial Subdivision, * * * and WHEREAS, EVANS has, *254 in connection with engineering expenses and filing charges for the approval of said subdivision, architect's fees, leasing expenses and legal fees, as well as deposits, invested in said project, to date, the sum of Seventy Thousand ($70,000.00) Dollars, * * * and WHEREAS, said parties have agreed and EVANS will execute the necessary assignments and/or designations to the end that title to said real property will be vested in the within parties as tenants in common, such vesting of title and the future ownership, management and improving of said land being conditioned on the terms, covenants and agreements herein contained. THEREFORE, in consideration of the premises, the parties hereto mutually agree as follows: 1. M.H.S. will, prior to or simultaneous with the acquisition of title to said land, contribute to the common fund of the joint venturers the sum of Seventy-five Thousand ($75,000.00) Dollars, and at the same time EVANS will contribute the sum of Five Thousand ($5,000.00) Dollars, thereby equalizing the investments of the parties. 2. M.H.S. will, prior to or simultaneous with the acquisition of title to said land, loan to the joint venturers the sum of One Hundred *255 Thousand ($100,000.00) Dollars, same to be evidenced by the note of the joint venturers due one (1) year after date together with interest at the rate of six (6%) per centum per annum, such note to be secured by a first lien Deed of Trust executed by the joint venturers conveying in trust Lots 5 and 6 of said Poplar-Pauline Commercial Subdivision. 3. M.H.S. will continue to renew and extend the time for payment of the note described in paragraph 2., above, until such time as a permanent loan is placed upon the security of said Lots 5 and 6, it being expressly understood and agreed, however, that the parties will make every effort to obtain said permanent loan at the earliest practicable time, and it is further understood and agreed that M.H.S. shall have no obligation to renew and/or extend the time for payment of said note beyond three (3) years from the date of said note. 4. EVANS having heretofore obtained a loan commitment from Percy Galbreath & Son, Inc., Memphis, Tennessee, for a loan of Three Hundred Fifty Thousand ($350,000.00) Dollars upon the security of a first lien Deed of Trust conveying in trust Lots 1, 2, 3 and 4 of said Poplar-Pauline Subdivision, the primary *256 purpose of such loan being to improve said lots according to drawings, plans and specifications heretofore obtained by EVANS, the joint venturers will, simultaneously with acquiring title to said tract of land, execute and deliver to Percy Galbreath & Son, Inc. a note for said sum drawn pursuant to the loan commitment, and will, also, execute and deliver to said lender the first lien Deed of Trust hereinabove described, it being understood and agreed that if said lender shall require personal endorsements, EVANS will obtain same in accordance with the lender's requirements. 5. Upon acquisition of said tract of land, payment to the common fund of the cash contributions of the joint venturers, and the consummation and closing of the said loan of Three Hundred Fifty Thousand ($350,000.00) Dollars, the joint venturers will loan to EVANS the sum of Forty Thousand ($40,000.00) Dollars, EVANS to execute and deliver, as evidence of such loan, its note for said sum due on demand, without interest. 6. As hereinbefore set forth, every effort will be made by the joint venturers to erect improvements on said Lots 5 and 6 at the earliest practicable time, and it is understood and agreed *257 that a loan will be applied for in such connection, such application to be made by the joint venturers and any loan commitment accepted as a result of such application will be promptly and expeditiously complied with by the joint venturers, it being further understood and agreed that if the lender in such case shall require personal endorsements, EVANS will obtain same in accordance with the lender's requirements. It is understood and agreed that upon the closing of said loan, the aforesaid loan of One Hundred Thousand ($100,000.00) Dollars referred to in paragraph 2., above, will be paid in full and satisfied. 7. Upon the completion of the erection of improvements on said Lots 5 and 6, the joint venturers will pay to M.H.S. from the common fund, the sum of Forty Thousand ($40,000.00) Dollars, such payment to be made to M.H.S. as a reduction in its capital investment in this joint venture. Simultaneously with such payment to M.H.S., the joint venturers will cancel the EVANS note for Forty Thousand ($40,000.00) Dollars (described in paragraph 5., above), such cancellation to similarly have the effect of reducting [sic] the capital investment of EVANS in this joint venture. *258 8. If at any time cash deficiencies shall arise making impossible the accomplishment of the herein stated purposes of this joint venture, the necessary sum or sums to remedy any such deficiency will be contributed or loaned to the joint venture by the within parties, equally. Similarly, in the general ownership, management and operation of the commercial subdivision, profits and losses will be shared or borne, equally. 9. EVANS will, upon acquisition of title by the joint venturers to said tract of land, assign to the joint venturers all leases of said land then in existence, and the joint venturers hereby agree, in accepting such assignments, to assume all Lessor obligations contained in any such leases, including the payment of rental agent commissions theretofore agreed to by EVANS, provided that no commission or other compensation shall be due to EVANS in connection with such leases or for any other services rendered in connection with this project up to this date. 10. Both parties hereto shall have and are hereby granted by the other, the first right to purchase the interest of the other in this joint venture, and it is further understood and agreed that neither party *259 has or shall have the right to encumber its undivided interest in this joint venture without the written consent of the other. 11. Nothing contained in paragraph 10., above, shall be construed so as to preclude either of the joint venturers from making transfers of interests to any individuals who are, at the time, officers, directors, stockholders or partners of either of the within parties. Any transfer made pursuant to this paragraph, however, will be subject to all the terms, conditions and convenants contained herein. 12. This Joint Venture Agreement is conditioned upon consummation of the said contract with Memphis Housing Authority dated January 21, 1965. * * *
As of the date the Joint Venture Agreement was executed by the parties, the Evans had previously incurred a total expense of $70,000 in development costs which the parties agreed were properly chargeable to the joint venture. Therefore, in order to equalize the investment of the Evans and M.H.S., the corporation was to contribute $75,000 to the common fund and Evans Grading was to contribute $5,000. On March 10, 1967, Nate Evans and Irving Evans assigned to M.H.S. and Evans Grading Company, a partnership *260 composed of Nate and Irving Evans, all interest possessed by them in the contract with the Memphis Housing Authority dated January 21, 1965, for the purchase and sale of the Poplar Avenue property. The assignment was made with the written approval of the Memphis Housing Authority as required under the terms of the contract. Prior to March 10, 1967, Evans Construction Company, a partnership composed of Irving Evans and Nate Evans, and Irving Evans and Nate Evans acting in their individual capacity through Mr. Frager their real estate broker, had obtained advance commitments for leases with several businesses, the leases to commence upon the completion of the proposed improvements on the Poplar-Pauline property. Although a number of possible development alternatives had been discussed, a decision had been reached to construct a small shopping center on the property. The commitments obtained prior to the assignment of the contract by the Evans and the date of the lease agreements are as follows: [5] Lessor
Lessee
Date Executed
Evans Construction
Loeb's Barbeque
4/11/66
Evans Construction
International House
4/20/66
of Pancakes
Evans Construction
Model Bluff City
5/3/66
Laundry Cleaner, Inc.
Evans Construction
Jo Royce Gaia
6/15/66
Irving & Nate Evans
Texaco, Inc.
3/8/67
*261 On May 30, 1967, the lease commitment obtained from Texaco, Inc. was assigned by Irving Evans and Nate Evans. [6] The assignment which was executed by Irving Evans, Individually, and Nate Evans, Individually, reads as follows: That for and in consideration of the sum of Ten ($10.00) Dollars, cash in hand paid, and other good and valuable considerations, the receipt of all of which is hereby acknowledged, the undersigned IRVING EVANS and NATE EVANS hereby bargain, sell, convey and assign to M.H.S. COMPANY, INC. and EVANS GARDING COMPANY, a Partnership composed garding company,/ a Partnership composed of IRVING *262 EVANS and NATE EVANS, a Joint Venture created and existing pursuant to Agreement dated February 14, 1967. all of their right, title and interest, jointly and severally, in and to the following-described Lease, to-wit: G-77A Lease dated March 8, 1967, by and between Irving Evans and Nate Evans, Lessors, and Texaco, Inc., Lessee, a memorandum of which is of record in Lease Book 99, at Pages 217 and 218, in the Register's Office of Shelby County, Tennessee. TO HAVE AND TO HOLD said Lease unto said Joint Venture, it [sic] successors and assigns, together with each and every Lessor's rights contained and expressed therein. And the said Joint Venturers, M.H.S. COMPANY, INC. and EVANS GRADING COMPANY, a Partnership as aforesaid, do hereby ratify and confirm that they, as such Joint Venturers, are the owners of the fee to the land conveyed in said Lease; and that they hereby ratify all the terms, conditions and covenants contained therein, and do further hereby assume all the responsibilities, obligations and liabilities imposed upon the Lessor in said Lease and agree to carry out and put into effect the terms of said Lease, in each and every instance, the same and in the same *263 manner as agreed to by the original Lessors named therein. IN WITNESS WHEREOF, this instrument has been duly executed on this the 30th day of May, 1967. On April 11, 1967, a construction contract was entered into between "Evans Grading Company and M.H.S.Corp., DBA Poplar-Pauline Shopping Center, hereinafter called the Owner, and Milton Angel, hereinafter called the Contractor," for the construction of several buildings on the shopping center premises. The contract price as agreed upon by the parties was $140,200 or cost plus 7 percent, whichever was the lesser. The warranty deed from Memphis Housing Authority conveying the real property described by the contract of January 21, 1965, is dated April 3, 1967. The grantees in the deed are "M.H.S. Company, Inc., a Tennessee *264 Corporation, and Evans Grading Company, a partnership composed of Irving and Nate Evans." [7] The stated consideration for the conveyance is shown in the deed as $29,035 and receipt of the money was acknowledged. The deed was prepared on behalf of Memphis Housing Authority by an attorney for Mid-South Title Company on the basis of information furnished to the title company by a representative of Memphis Housing Authority. The closing, with delivery of the deed, was on April 20. It was conducted by a representative of Mid-South Title Company. Payment of $143,826.10 of the purchase price was by a check dated April 20, 1967, drawn on the Poplar-Pauline Shopping Center account payable to Mid-South and the balance from the proceeds of a $350,000 loan from Percy Galbreath & Son, Inc. The deed was recorded in Shelby County, Tennessee on April 21, 1967. Some legal documents executed with respect *265 to the property on which the shopping center is situated have been made in the name of "M.H.S. Company, Inc. and Evans Grading Company." These included an easement granted to Memphis Light, Gas and Water Division, and the loan agreement and Deed of Trust for Lots 1, 2, 3 and 4 executed pursuant to the loan obtained through Percy Galbreath. Other documents, however, were made in the name of Nate Evans, Irving A. Evans and M.H.S. Company, Inc., DBA Poplar-Pauline Commercial Subdivision. The premium statement for fire and peril insurance for the property was so captioned. A promissory note made in 1969 payable to a bank in Memphis in the sum of $7,500 was executed "Poplar-Pauline Shopping Center by Irving Evans, M.H.S. Company, Inc., by Justin Adler." As previously noted, the construction contract was entered into between Milton Angel and "Evans Grading Company and M.H.S. Corporation, DBA Poplar-Pauline Shopping Center." On April 20, 1967, the parties carried out the financial obligations agreed upon in the joint venture agreement. M.H.S. contributed $75,000 by check made payable to Poplar-Pauline Shopping Center into a separate bank account captioned Poplar-Pauline Shopping Center. *266 Evans Grading Company contributed $5,000 to this account to equalize the contributions of the joint venturers. Pursuant to paragraph 2 of the joint venture agreement, M.H.S. also placed a $100,000 deposit in the Poplar-Pauline Shopping Center bank account. M.H.S. received a promissory note for $100,000 executed by "M.H.S. Company, Inc., by Justin Adler, President," and "Evans Grading Company, a Partnership, By Irving Evans, Partner and Nate Evans, Partner." The note, as previously agreed, provided for interest at a 6 percent annual rate and was for a term of one year. The note was secured by a Deed of Trust dated April 20, 1967, for Lots 5 and 6 of the property. The document stated: "This Indenture made and entered into this 20th day of April, 1967 by and between M.H.S. COMPANY, INC., a Tennessee corporation, and EVANS GRADING COMPANY, a Partnership composed of Irving Evans and Nate Evans, a Joint Venture created and existing pursuant to Agreement dated February 14, 1967, * * * and LEWIS R. DONELSON, III, Trustee, * * *." [8] The Deed of Trust was executed in the same manner as the $100,000 note it secured. The purpose of the $100,000 loan was to provide the joint venture *267 with additional funds needed to complete the purchase of the land. Also on April 20, 1967, M.H.S., Irving Evans and Nate Evans executed two promissory notes in the amount of $175,000 each to Percy Galbreath & Son, Inc. for the $350,000 construction loan for which commitment had previously been received. The security for these notes was the Deed of Trust executed by "M.H.S. Company, Inc., a Tennessee corporation, and Evans Grading Company, a partnership composed of Irving Evans and Nate Evans," covering Lots 1, 2, 3 and 4 of the Poplar-Pauline property. Paragraph 5 of the joint venture agreement provided that the joint venturers would loan $40,000 to Evans Grading Company. On April 20, 1967, this sum and an additional $15,000 were advanced to the Evans as a loan, with Evans Grading Company executing two promissory notes in the amounts of $40,000 and $15,000, respectively, payable to "M.H.S. Company, Inc. and Evans Grading Company, a Partnership composed of Irving Evans and Nate Evans, a Joint Venture created and existing pursuant to Agreement dated February 14, 1967." The parties made loans to the joint venture in addition to the financial *268 undertakings specifically specified in the joint venture agreement. M.H.S. and Evans Grading Company each loaned an additional $6,000 to the joint venture depositing the funds in the Poplar-Pauline Shopping Center account. The parties maintained the separate bank account in the name of Poplar-Pauline Shopping Center to which the initial funds provided for in the joint venture agreement were deposited on April 20, 1967, using as its address that of Evans Grading Company. All rental money received from the shopping center and all expenses incurred were handled through this checking account. The account provided that both Evans Grading Company and M.H.S. were to sign all checks drawn on the account. For the month of April 1967, the separate account reflected total deposits of $192,000 from the following sources: $ 6,000
Loan from M.H.S.
6,000
Loan from Evans Grading Company
100,000
Loan from M.H.S.
75,000
Contribution from M.H.S.
5,000
Contribution from Evans Grading Co.
$192,000
Total
Subsequent to the acquisition of title of the shopping center property by M.H.S. and Evans Grading Co., two additional leases were executed. On August 14, 1967, a shop *269 was leased by Evans Grading Company and M.H.S. to Harlow's Honey Fluff Do-Nut Shop #7 for a ten-year period. On July 30, 1968, a shop was leased to the Pink Lady Restaurant and Lounge also for a ten-year-period. The construction of improvements resulted in one long building containing a liquor store, lounge, doughnut shop, laundry and barbeque restaurant. Separate buildings housed the pancake house and the service station leased to Texaco. [9]
During the construction of the shopping center, Dr. Adler of M.H.S. and Irving Evans both dealt with the contractor. Where special knowledge of the construction industry was required, Mr. Evans was consulted because of his expertise in such matters. A substantial portion of the management of the property, after its construction, was handled by Mr. Frager. He collected rent, billed tenants for outdoor maintenance performed for them and tax increases occasioned by the construction of additional facilities by the tenants, and took care of repairs that were the lessor's responsibility. Although the realty company handled *270 the majority of the management activities, Dr. Adler and Mr. Evans occasionally became involved with various operations of the shopping center. Where repairs were of a significant nature, both Dr. Adler and Mr. Evans were consulted. On routine business matters, such as minor repairs, Mr. Frager generally obtained approval from Mr. Evans and forwarded a copy of his correspondence with Mr. Evans to Dr. Adler. If a matter concerning the property was brought to Dr. Adler's attention first, he would get in touch with Mr. Evans and Mr. Frager and attempt to make arrangements to resolve the problem. Mr. Evans personally arranged for insurance for the property, for the employment of an accounting firm, and for a bookkeeper from his offices to maintain the shopping center's books and records. The opening entries of the books of the joint venture made as of April 30, 1967, were as follows: Debit
Credit
Cash on Deposit
$ 1,071.40 $
Legal
102.50
Interest - April
239.52
Land
333,826.10
Note Receivable
Evans & Evans
62,000.00
Loan Payable
P. Galbreath
135,239.52
Dr. Adler
100,000.00
Net Worth
Dr. Adler
81,000.00
Evans & Evans
81,000.00
To record opening entries
and formation of Poplar-
Pauline Shopping Center
partnership.
*271 Subsequent journal entries made on the books maintained for the shopping center established capital accounts which were credited from time to time to reflect additional investments by M.H.S. and Evans in the joint venture. Each party made an additional contribution of $13,000 for the period ending December 31, 1968, and $2,000 for the period ending December 31, 1970. Although the books of the shopping center were kept by an employee of Evans Grading Company, tax returns were prepared by an independent certified public accounting firm employed by Mr. Evans. The accounting firm prepared and filed a partnership return (Form 1065) for the calendar year 1967 in the name of Poplar-Pauline Shopping Center, showing the business address to be that of the offices of Evans Grading Company. The partnership returns filed for the calendar years 1968 and 1969 were filed in the name of Evans and Evans (Evans Grading Company) and M.H.S. Company, Inc., Poplar-Pauline Shopping Center. The returns were signed by either Irving Evans or Nate Evans. These returns were prepared by an accountant with knowledge of the joint venture agreement. The 1967, 1968 and 1969 partnership returns reported losses *272 of $8,516.05, $16,091.54 and $1,607.61, respectively. In Schedule K of the partnership returns filed, the partners were stated to be M.H.S. and Evans and Evans. Under the heading "land" of Schedule L, an amount greater than the purchase price of the property was reflected on each of these returns as were the mortgage loans obtained for the improvements. On Schedule M of these returns, the accounts of M.H.S. and Evans Grading Company were adjusted to reflect ordinary losses sustained by the shopping center and further contributions that had been made. On its corporate income tax returns for the years ended September 30, 1967 and 1968, petitioner listed as an asset on Schedule L land which included the real estate of the shopping center. The following statement was contained on the corporate income tax return for its year ended September 30, 1969: "$110,221.90 reclassified from land to investment in joint venture for September 30, 1968." The "land" account on the balance sheet was reduced by this amount. On this return a net loss of $3,333.84 was reported after deducting a loss of $8,045.77 as a net loss from Poplar-Pauline Shopping Center. On the corporate income tax return *273 of M.H.S. for its fiscal year ended September 30, 1968, a loss of $3,397.46 was reported with no deduction being shown as a loss from the Poplar-Pauline Shopping Center. On the return filed for the 1970 fiscal year, the Poplar-Pauline asset was shown as an investment in a joint venture. On this return, income of $4,230.44 was reported before a deduction of net operating loss carryover. In arriving at the $4,230.44 reported income, a deduction of $803.81 was taken and designated "Net loss from Poplar-Pauline Shopping Center: Joint Venture." In his statutory notice of deficiency, respondent increased the gross income of petitioner for the year ended September 30, 1966, by $77,778.10 of capital gain and increased the gross income for the year ended September 30, 1969, by $7,451.60 of capital gain with the following explanation: In your return for the taxable year ended September 30, 1966, you failed to include gain of $77,778.10 in taxable income, describing such amount as gain from involuntary conversion, money to be reinvested. There was no conversion into similar property within the period provided in section 1033, Internal Revenue Code, and the gain should *274 be recognized. Accordingly, your taxable income for the taxable year ended September 30, 1966, is increased by $77,778.10. Similarly, in the taxable year ended September 30, 1969, you failed to report the gain from the additional amount that you received as a result of legal proceedings which you instigated in connection with this condemnation. Further, there was no conversion into similar property within the period provided in section 1033, I.R.C. Therefore, your taxable income for the taxable year ended September 30, 1969, is increased by $7,451.60, * * *. OPINION Section 1033[10] is an exception to the general rule of section 1002 that the amount of gain to be recognized upon the sale or exchange of property is the excess of the amount realized over the adjusted basis of such property. Section 1033, in part, provides that where property has been condemned and converted into money the gain realized will not be recognized to the extent the money is used to purchase other property similar or related in service or use to the property converted if the cost of the property acquired exceeds the amount relized on the converted property. The section further *275 provides that nonrecognition must be elected by the taxpayer and reinvestment made within a two-year period. *276 In the case of real property held for productive use in a trade or business or for investment converted as a result of condemnation, section 1033(g)[11] provides that property of a like kind to be held for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the converted property for purposes of section 1033(a). [12]Section 1.1033(g)-1(a), Income Tax Regs., [13] provides that in determining whether the replacement property is property of like kind, the principles of section 1.1031(a)-1(b), Income Tax Regs., [14] are to be applied. *277 The parties agree the reinvestment of proceeds received by M.H.S. upon the condemnation of the real estate situated on North Waldran and Poplar Avenue was made within the time period requirements of section 1033(a)(3)(B). The parties are also in agreement that the property condemned by the State of Tennessee was real property held by M.H.S. for productive use in a trade or business or for investment purposes within the requirements of section 1033(g). The only issue for us to determine is whether the proceeds received pursuant to the condemnation award were reinvested in "like kind" property as required under section 1033(g). It is petitioner's contention the requirements of nonrecognition of gain have been met because the proceeds received from the State of Tennessee were used to purchase real estate held for productive use in a trade or business or for investment as tenants in common with Evans Grading Company and that the purchase price of such property exceeded the amount realized upon condemnation of the other property. Respondent's argument is that petitioner failed to make a "purchase" of "like kind" property. Respondent maintains petitioner invested the proceeds *278 of the condemnation award in a joint venture, which constitutes a partnership for the purposes of this case, and that the partnership interest acquired by M.H.S. is an interest in personal property. Therefore, respondent maintains the acquisition was not "like kind" property. Respondent also maintains that petitioner failed to meet the requirements of section 1033 because petitioner did not "purchase" its interest in the new property because the basis of such property is not a cost basis as determined by section 1012, but rather the basis of its interest is determined by reference to section 722. Petitioner, to sustain its position, relies primarily on the fact that the record title of the real property situated at Poplar Avenue and Pauline Street in Memphis obtained from the Memphis Housing Authority by warranty deed delivered April 20, 1967, was conveyed to M.H.S. and Evans Grading Company as tenants in common. Petitioner contends that the facts show that M.H.S. and Evans Grading Company each acquired a 50 percent undivided interest in the real estate. Petitioner also argues that the parties to the transaction did not intend to form a partnership, but intended to acquire, develop *279 and maintain the property as tenants in common with the name Poplar-Pauline Shopping Center being merely a matter of convenience and to provide a name for the separate bank account.Petitioner contends that the joint venture agreement was merely a means of handling the financing of the property. On their face the warranty deed and closing papers show the property as having been acquired by M.H.S. and the Evans as tenants in common. Respondent contends that this fact is not of consequence since the record clearly shows that petitioner invested the proceeds from the converted property in a joint venture and that all funds invested in the real property were joint venture funds. Respondent contends that the joint venture in which petitioner invested its funds is a partnership both under Tennessee law and Federal tax law. In our view the facts here show clearly that petitioner invested the funds it received upon the condemnation of its property in the joint venture. The evidence shows no payment by petitioner to the grantor of the property but only payments to the joint venture. We must therefore determine whether petitioner's investment in this joint venture was as it contends an *280 investment in real property of a "like kind" to the condemned property or was as respondent contends an investment in a partnership with the result of the interest petitioner acquired being personal property. The issue here requires both a factual determination of the nature of the investment and a legal determination of the interest acquired from the investment. To determine the type of property interest acquired by petitioner from its investment in the joint venture, it is necessary to consider the nature of that interest under the laws of Tennessee. See Oregon Lumber Co.,20 T.C. 192 (1953); and Commissioner v. Crichton,122 F. 2d 181 (5th Cir. 1941), affirming 42 B.T.A. 490 (1940). Tennessee has adopted the Uniform Partnership Act. Tenn. Code Ann. tit. 61, secs. 101-142. Under this act, a partnership is defined as "an association of two (2) or more persons to carry on as coowners a business for profit." [15] Tenn. Code Ann. tit. 61, sec. 106, in part provides: 61-106. Determination of existence of partnership.--In determining whether a partnership exists, these rules shall apply: * * *
(2) Joint tenancy, tenancy in *281 common, tenancy by the entireties, joint property, common property, or part ownership does not of itself establish a partnership, whether such coowners do or do not share any profits made by the use of the property. (3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived. (4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment (a) as a debt by instalments or otherwise; (b) as wages of an employee or rent to a landlord; (c) as an annuity to a widow or representative of a deceased partner; (d) as interest on a loan, though the amount of payment vary with the profits of the business; or (e) as the consideration for the sale of the good will of a business or other property by instalments or otherwise. * * * *282 Although petitioner contends that it was not the intent of the parties to form a partnership for the acquisition and development of the shopping center property, in our view it is clear from the objective evidence before us, including testimony of petitioner's president, that M.H.S. and the Evans formed "an association * * * to carry on as co-owners a business for profit" as of the date of the execution of the joint venture agreement. By the provisions of this agreement and the actions of the parties, it is clear that M.H.S. and the Evans were not merely co-owners of property as tenants in common. Therefore, under Tennessee law petitioners and M.H.S. were partners in the Poplar-Pauline Shopping Center. [16]
*283 Under Tennessee law a joint venture which comes within the definition of "partnership" is a partnership under the statute and the provisions of the statute are applicable to such an association. A joint venture is generally defined as an association of persons to carry on a single business transaction for profit. It is usually something of a temporary nature. Garner v. Maxwell,360 S.W. 2d 64, 67-68 (Tenn. App. 1962), and the authorities therein cited. The agreement before us would more appropriately be captioned a partnership agreement under the authorities examined in the above opinion because the parties have planned further development of the property to include a medical center, once such development is economically feasible, and, in any event, intend to operate the shopping center for an indefinite period of time.
Our determination that the agreement of the parties created a partnership and that the property was acquired and developed by the partnership is based upon examination of a number of objective factors. The agreement between M.H.S. and the Evans was not a chance event. This agreement was reached after negotiation and because each party provided *284 an element needed to develop the property. The Evans possessed the contract for sale, had acquired advance lease commitments and had technical knowledge of the construction business. M.H.S., because of the condemnation award, had the money necessary to get the project started. The joint venture agreement executed was specific in nature and represented the intent of the parties. Pursuant to the agreement, M.H.S. and the Evans equalized their contributions to the common fund, agreed to share profits and losses equally, agreed to make further cash contributions if necessary (and in fact did make later contributions when such were necessary), and in the management of the shopping center there was to be mutual control. [17]
*285 Several other factors indicate that the parties intended that the joint venture be the vehicle for operation and development of the shopping center property. Initial contributions and monies loaned were made to the joint venture. There was never any consideration for an interest in land that passed directly from M.H.S. to Evans Grading Company or to the Memphis Housing Authority. All funds provided by M.H.S. were channeled through the common fund.The purchase price of the land was $290,035. Payment for the land was by a check drawn on the Poplar-Pauline Shopping Center account in the amount of $143,826 and use of proceeds of a loan secured by part of the property acquired. Dr. Adler, the president of M.H.S., testified that M.H.S. lent the joint venture $100,000 because the joint venture needed additional funds to complete the purchase of the land. A further indication that the parties believed the joint venture had acquired an interest in the land is the fact that to further secure the debt of the joint venture to M.H.S. a Deed of Trust was executed covering two lots of the land within the subdivision property stated to be between "a Joint Venture created and existing pursuant *286 to Agreement dated February 14, 1967" and the trustee. Although the joint venture agreement stated the property was to be acquired by the parties as tenants in common, the transactions in evidence do not support this assertion. The deed, although noting no joint venture agreement between the parties, was prepared by an attorney for the title company from instructions of the Housing Authority. As such, the deed conforms with the names of the parties appearing in the contract for sale and was made without knowledge of a prior written joint venture agreement. The evidence before us shows that the common fund provided the consideration for the property. We do not consider that the deed itself shows an intention to purchase the property as tenants in common to be held separate and apart from the joint venture. The books of the shopping center were maintained by an employee of Evans Grading Company. The initial contributions to the common fund were characterized as petitioner's net worth in the partnership formed. Subsequent entries made were consistent with the characterization of the shopping center as a partnership. Partnership tax returns were filed by an independent certified *287 public accounting firm retained by the parties, with such returns being prepared with knowledge of the joint venture agreement. [18] These returns reflected the land and improvements as being partnership assets and the liabilities portion of the balance sheet included mortgage financing obtained from Percy Galbraeth. The accounting treatment of the books and filing of partnership tax returns from information furnished by the parties are further indications of the understanding of the parties to treat the development as a joint venture and therefore a partnership. Under Tennessee law, property acquired with partnership funds is partnership property unless a contrary intention appears. [19] Payment for the property (other than from loan proceeds) was by a check drawn on the common fund. In our view there was no intention shown by the action of the parties *288 to hold the land outside the joint venture. In fact, the clear intention shown by the facts in this record is that the property is property of the joint venture. For this further reason we conclude that the property was partnership property. [20]
Under Tennessee law, an interest *289 acquired in a partnership is an interest in personalty regardless of the fact that the underlying assets of the partnership include interests in real property. Cultra v. Cultra,221 S.W. 2d 533 (Tenn. 1949), holds that Tennessee will follow the rule of "out and out" conversion, which rule is that property acquired by the partnership, from the partnership fund, for partnership purposes, becomes personalty for all purposes.
The words property of "like kind" refer to the grade or quality of the property. Section 1033 is not applicable if one kind of property is exchanged for another kind. An exchange of an interest in real property for an interest in personal property is not an exchange of "like kind" property since the property interests are not of the same kind or class.See Oregon Lumber Company,supra, which was decided under section 112(b)(1) of the 1939 Internal Revenue Code, which is the predecessor of and is substantially similar to section 1031(a). See also Commissioner v. Crichton,supra.The differences in a partnership interest and ownership of real property are substantial and an investment of funds from a condemnation *290 of real estate in a partnership interest does not result in the continuity in the nature of the investment necessary to bring the transaction within the nonrecognition of gain provisions of section 1033. See Estate of Rollin E. Meyer, Sr.,58 T.C. 311, 314 (1972). Our determination that petitioner did not acquire "like kind" property pursuant to the reinvestment of the condemnation proceeds makes it unnecessary to consider respondent's alternative argument that petitioner did not "purchase" an interest in property of "like kind" because the basis of the partnership interest it acquired would not be a cost basis under section 1012. However, section 1.1033(a)-2(c)(4), Income Tax Regs., does support respondent's alternative argument. It in part provides that if the unadjusted basis in the replacement property, in the absence of section 1033(c), would be determined under any of the exceptions referred to in section 1012, the unadjusted basis would not be its cost within the meaning of section 1012. One of the exceptions referred to in section 1012 is Subchapter K which includes section 722 providing for the determination of basis in a partnership interest. Decision *291 will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
2. Petitioner, in addition to the award for its real property, received an award of $131 for personal property. Its basis in this personal property was $131. Since there was no gain on the conversion of the personal property, there is no issue in the case with respect to this personal property.↩
3. The net total award received by petitioner with respect to the condemnation proceedings was $132,409.42.↩
4. The final sale price as based upon the survey was determined to be $290,035.↩
5. The terms of these advance lease commitments varied. The agreement reached with Loeb's Barbeque, Model Bluff City Laundry Cleaner, Inc. and Jo Royce Gaia provided that the term of the lease was to begin on October 1, 1966, and run for a ten-year-period. However, if the premises to be supplied to the tenant were not complete on that date, then the ten-year-period would begin from the date of completion. Memorandum of such agreements were recorded in the public records of Shelby County, Tennessee subsequent to the date the Joint Venture Agreement was executed.↩
6. The record indicates that agreement on the Texaco, Inc. Lease had been reached prior to February 10, 1967, even though the lease was not executed until March 8, 1967. Although the minutes of the board of directors' meeting of February 10, 1967, stated other advance lease commitments that had been obtained would be assigned to the joint venture, the only lease so assigned was the Texaco lease.↩
7. The closing statement prepared by Mid-South Title Company indicates the purchaser of the property as "Evans Construction Company and M.H.S. Company, Inc." The title insurance policy issued by Mid-South indicates the policy was issued to "M.H.S. Company, Inc. and Evans Grading Company."↩
8. Mr. Donelson is counsel for M.H.S.↩
9. A portion of the land remains vacant and it is the intent of the parties to some day construct a medical building.↩
10. SEC. 1033. INVOLUNTARY CONVERSIONS. (a) General Rule.--If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- * * *
(3) Conversion into money where disposition occurred after 1950.--Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. For purposes of this paragraph-- (i) no property or stock acquired before the disposition of the converted property shall be considered to have been acquired for the purpose of replacing such converted property unless held by the taxpayer on the date of such disposition; and (ii) the taxpayer shall be considered to have purchased property or stock only if, but for the provisions of subsection (c) of this section, the unadjusted basis of such property or stock would be its cost within the meaning of section 1012. (B) Period within which property must be replaced.--The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending-- (i) 2 years after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary or his delegate, at the close of such later date as the Secretary or his delegate may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary or his delegate may by regulations prescribe. * * *↩
11. Sec. 1033(g) Condemnation of Real Property Held for Productive Use in Trade or Business or for Investment.-- (1) Special rule.--For purposes of subsection (a), if real property (not including stock in trade or other property held primarily for sale) held for productive use in trade or business or for investment is (as the result of its seizure, requisition, or condemnation, or threat or imminence thereof) compulsorily or involuntarily converted, property of a like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted. (2) Limitations.-- (A) Purchase of stock.--Paragraph (1) shall not apply to the purchase of stock in the acquisition of control of a corporation described in subsection (a)(3)(A). (B) Conversions before January 1, 1958.-- Paragraph (1) shall apply with respect to the compulsory or involuntary conversion of any real property only if the disposition of the converted property (within the meaning of subsection (a)(2)) occurs after December 31, 1957. ↩
12. Respondent's statutory notice of deficiency stated that there had been no conversion into similar property. By amendment to answer respondent denied that the proceeds were reinvested in "like kind" property, the proper and more liberal test under sec. 1033(g)↩. 13. Sec. 1.1033(g)-1(a) [Income Tax Regs.] Special rule in general. This section provides special rules for applying section 1033 with respect to certain dispositions, occurring after December 31, 1957, of real property held either for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale). For this purpose, disposition means the seizure, requisition, or condemnation (but not destruction) of the converted property, or the sale or exchange of such property under threat or imminence of seizure, requisition, or condemnation. In such cases, for purposes of applying section 1033↩, the replacement of such property with property of like kind to be held either for productive use in trade or business or for investment shall be treated as property similar or related in service or use to the property so converted. For principles in determining whether the replacement property is property of like kind, see paragraph (b) of section 1.1031(a)-1. 14. Sec. 1.1031(a)-1(b) [Income Tax Regs.] As used in section 1031(a), the words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under that section, be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimprovided is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. Unproductive real estate held by one other than a dealer for future use or future realization of the increment in value is held for investment and not primarily for sale.↩
15. Tenn. Code Ann. tit. 61, sec. 105(1). The word "person" includes corporation so that a corporation may be a partner. Memphis Natural Gas Co. v. Pope,161 S.W. 2d 211 (Tenn. 1941), affd. sub nom. Memphis Natural Gas Co. v. Beeler,315 U.S. 649↩ (1942).
16. Our conclusion that the parties created a partnership under Tennessee law for the purchase and operation of the commercial subdivision is a conclusion consistent with the concept of a partnership for purposes of Federal income taxation. Under tax law a joint venture arises "when two or more persons agree, expressly or impliedly, to enter actively upon a specific business enterprise, the purpose of which is the pursuit of profit; the ownership of whose productive assets and of the profits generated by them is shared; the parties to which all bear the burden of any loss; and the management of which is not confined to a single participant." F. C. McDougal,62 T.C. 720, 725 (1974), acq. 1975-1 C.B. 2. The Subchapter K provisions apply to a joint venture in the same manner as to a partnership. Sec. 761; Hubert M. Luna,42 T.C. 1067, 1076-1077 (1964). The determination of whether a partnership exists for purposes of tax law is a question of fact. A critical element in this examination is whether the parties intended to carry on a business, or venture as a partnership. Mihran Demirjian,54 T.C. 1691, 1697 (1970), affd. 457 F. 2d 1 (3d Cir. 1972). The evidence before us in this case shows that M.H.S. and the Evans had formed a joint venture or partnership for purposes of Federal taxation. Also see sec. 1.761-1(a), Income Tax Regs.↩
17. We note the bank account maintained for the shopping center required signatures on checks by both M.H.S. and Evans Grading Company rather than only one party. Clause 8 of the joint venture agreement provided that in the "general ownership, management and operation of the commercial subdivision, profits and losses will be shared or borne, equally." In actual practice the management was shared on occasion and on occasion handled by one party when necessary without approval of the other.↩
18. After partnership returns were filed by the accounting firm for two years, Dr. Adler did notify the firm that the development of the shopping center was not a partnership but was a joint venture. This was done because of Dr. Adler's belief that there is a distinction between a joint venture and a partnership for tax purposes.↩
19. Tenn. Code Ann. tit. 61, sec. 107. ↩
20. The parties have not been consistent in the name under which documents were executed in the development and operation of the shopping center. On several occasions documents were captioned with the parties' names doing business as Poplar-Pauline Shopping Center or the notation "a joint venture" following the recitation of their names. These documents included the execution of the construction contract, the Deed of Trust on two lots, insurance on the property, and a promissory note executed to a bank in Memphis. The Tennessee Supreme Court has held that where real property is "acquired by partnership out of partnership funds and for partnership purposes" it is partnership property even though acquired in the names of the individual partners without the "trade name" being inserted in the deed. Cultra v. Cultra,221 S.W. 2d 533, 534↩ (Tenn. 1949).